**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NAIEF ISMAIEL,

  Petitioner,

  v.

MICHAEL MUKASEY[1], United States
Attorney General,

  Respondent.

No. 06-9588

---

**PETITION FOR REVIEW OF AN ORDER OF**
**THE BOARD OF IMMIGRATION APPEALS**

---

Submitted on the briefs:

Jayne E. Fleming, Reed Smith LLP, Oakland, California, for Petitioner.

Linda S. Wernery, Assistant Director, (Angela N. Liang, Trial Attorney, with her
on the brief), United States Department of Justice, Office of Immigration
Litigation, Washington DC, for Respondent.

---

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

[1]Mr. Michael Mukasey has been substituted for Alberto Gonzales per Fed.
R. App. 43(c)(2).

A native and citizen of Syria, Petitioner Naief Ismaiel claims that he will

be persecuted on account of his political opinion if he is returned to his home

country. He seeks review of a decision by the Board of Immigration Appeals

(BIA) dismissing his appeal of the denial by an immigration judge (IJ) of his

application for asylum and restriction on removal[2] under the Immigration and

Nationality Act (INA), 8 U.S.C. § 1101, *et seq.*, and for relief under the

Convention Against Torture (CAT).[3] Both the IJ and BIA disbelieved his

testimony that he had been tortured in Syria because he had not mentioned the

torture in his typed application or in letters submitted two weeks before his

testimony. Mr. Ismaiel does not challenge the denial of asylum but argues that

(1) the BIA erred as a matter of law in ruling that an adverse-credibility finding

can be based on omissions in his asylum application; (2) the BIA erred as a matter

of law in ruling that an adverse-credibility finding is sufficient to preclude a

---

[2] Restriction on removal was known as *withholding of removal* before amendments to the INA made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 100 Stat. 3009. The regulations under the INA, however, retain the former term *withholding of removal*, *see*, *e.g.*, 8 C.F.R. § 208.16(b), and both the IJ and the BIA have referred to *withholding of removal*. Nevertheless, we use the statutory term *restriction on removal*. *See Wiransane v. Ashcroft*, 366 F.3d 889, 892 n.1 (10th Cir. 2004).

[3] "The Convention Against Torture is formally referred to as The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85. The United States implemented the Convention Against Torture through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (1998)." *Niang v. Gonzales*, 422 F.3d 1187, 1191 n.2 (10th Cir. 2005).

claim under the CAT; and (3) this court should remand for further proceedings because the IJ and BIA failed to consider his claim that the Syrian government believes him to be a supporter of the Muslim Brotherhood and routinely imprisons and tortures members of that group.

We have jurisdiction under 8 U.S.C. § 1252(a) and affirm. As to the first two arguments, we hold that the BIA could properly find that Mr. Ismaiel had failed to satisfy his burden of persuasion that he faced persecution or torture in Syria. In particular, we reject his argument that the BIA and IJ must follow rigid rules contrary to common sense in making credibility findings. We hold that he forfeited his third argument by failing to present it to the BIA.

## I. BACKGROUND

Mr. Ismaiel entered the United States on a six-month tourist visa on December 2, 1999. He exceeded his authorized stay but was granted an extension to June 1, 2001. After he stayed beyond that deadline, the Immigration and Naturalization Service (INS) sent him on February 6, 2003, a notice to appear stating that he was subject to removal for remaining in this country without authorization.

The initial hearing was conducted on July 3, 2003. Mr. Ismaiel was represented by counsel throughout the removal proceedings. At the initial hearing he admitted removability but the proceeding was continued to September 17, 2003, when he stated that he would seek asylum and restriction on removal to

Syria. At the September hearing Mr. Ismaiel submitted a typed Form I-589 application for asylum, restriction on removal, and relief under the CAT. The form includes a series of questions asking the applicant to explain whether he has ever been harmed in his home country. In response to the question whether "you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone," R. at 130, Mr. Ismaiel stated: "My brother, Alaam [sic], was imprisoned for criticizing the government." *Id*. In response to the question, "Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States," *id*. at 131, he stated: "My brother, Alaam [sic], was imprisoned for criticizing the government." *Id*. The IJ accepted the application and set the hearing for June 30, 2005.

On June 14, 2005, two weeks before the hearing on the application, Mr. Ismaiel supplemented his application with letters from his former coworker, Hussien Ibrahim; his brother, Allaam Ismaiel; and himself. The former coworker stated that, despite being a man of "integrity" and "high morals," Mr. Ismaiel was "arrested many times by the secret security service for questioning . . . ." *Id*. at 211. His brother stated that he himself had been arrested by the "secret security service," "subjected to a great deal of torture," and imprisoned for five years, *id*. at 213, and that Mr. Ismaiel had been arrested by the secret security service but was warned by a friend in the service that he should "leave the country because if

-4-

ever he gets arrested again while he [the friend] is not there, [he] will be put in prison for life." *Id.* In his own letter Mr. Ismaiel described an incident in which he encountered a friend when he reported to the Intelligence Office:

> [W]hen I went to the Intelligence Office, I found that the interrogator there was my friend. I knew this guy for a long time, and he said, "You have good luck I'm here. If I was not here you would be in the prison for the rest of your life, and this is a secret just between us. Now you have to leave the country immediately. Go to any country in the world."

*Id*. at 217.

Apparently for the purpose of establishing that Syrian officials torture individuals accused of membership in the Muslim Brotherhood, Mr. Ismaiel submitted (1) United States State Department reports from 2002 to 2004 on human rights practices in Syria and (2) Amnesty International reports on Syria for 2002 to 2004. None of the supplemental materials include evidence that Mr. Ismaiel was harmed by the Syrian government.

At the hearing before the IJ on June 30, 2005, Mr. Ismaiel claimed that in Syria he had been called into the Intelligence Office on three occasions. He asserted for the first time that during two of those occasions he had been tortured by Syrian officials. We quote the relevant portions of Mr. Ismaiel's testimony during direct examination by his counsel:

> Q: Why did you want to come to the U.S.?
> A: In my country I was exposed to a lot of sufferings through a lot of torture and insulting, and every now and then I was used to be called by the Intelligence Office to torture me.

Q:     The Intelligence Office would randomly call you or did they have specific reasons they gave you?

A:     In our country there is no regular exiting system, everything goes randomly.  They could call me at night, during the day, at their request.

Q:     Did this happen throughout your life or did it start at a certain time?

A:     It actually happened before I came to the United States of America, maybe two to three years before I came here.

Q:     What happened exactly?

A:     The first time it happened when they called me to the branch of the Intelligence Office in the country and they began in a very harassing way to interrogate and investigate with me, they asked me whether I didn't like the current government system.  Of course if you say the truth you will be completely destroyed and messed up, so I denied the truth.

Q:     That was the first time they called you?

A:     Yes, that was the first time.

Q:     How many more times did they interrogate you?

A:     That was the first time.  That was the second time when—the second time when I was called again they began to interrogate in a very harassing way, and you know in our country there is a lot of torture and they are used to put you down.

Q:     Do you remember the dates when this happened?

A:     I do recall the last time.  What I recall it was around two months before I came to America here.

Q:     You've indicated in your letter that you had problems with purchasing a home.

A:     Yes, I applied actually for to purchase a house and I put a down payment the amount of 10,000 (indiscernible), and I still was used to pay monthly payments for the house, that was at the Housing Department in 1975.  Now it's over 50, I haven't got a house yet.

Q:     During the interrogation did they question you about your home as well?

A:     They did ask me about the house issue and I answered them that I was applying for a house about 30 years ago and since that time I haven't got a house and I was just telling the truth.  And as you know in our country you cannot say the truth, you can't go straightforward.  After that I was recalled and to report to them the second time.

Q:     During the interrogation what type of questions or what type of harm did you receive?

A: In our country while holding the interrogation and the investigation they are used to use all different types of torture including electric shocking, including beating with the sticks. This is what they are used to do.

Q: Did those—did the electric shock and the beating with the sticks happen to you?

A: Yes.

Q: Did it happen at every interrogation you went to?

A: That happened during the first time, it happened during the second time. The third, which was the last time, I by chance met with an officer whom I knew since I was a long time ago who recommended—he was working at the branch of that Intelligence Office and who recommended he told me if he were not there I would be imprisoned for life, and he said if I were in your situation I would go outside the country.

*Id*. at 88–91.

On cross-examination the government asked Mr. Ismaiel why he had failed to mention the torture incidents in his application. Mr. Ismaiel explained, "Because by our lives (indiscernible) as you know I'm very much confused and I'm feeling, suffering a lot of pain, and I don't know exactly how things are going." *Id*. at 106. Later the IJ questioned Mr. Ismaiel on the matter:

Q: On your asylum application the question, one of the questions ask you to explain in detail any harm or mistreatment that you suffered. The only thing you mentioned was that your brother was imprisoned for criticizing the government. Why didn't you mention that you had been beaten during interrogation on two occasions?

A: In fact if it would happen to explain in details about the current deteriorating situations and conditions in my country, (indiscernible) mistreatment is about 20 pages long would not be enough to do that.

Q: Why didn't you do that? The question asks you to do that.

A: As to brief the letter I had to send.

-7-

Q:      The letter that you did send doesn't mention that you were
        beaten on two occasions.  Do you know why that is?
A:      As you know I am an old person and I frequently forget too
        much things.  This is why I didn't mention.
Q:      You forget that you had been beaten on two occasions?
A:      I thought during that time that I was prepared to talk in details
        in the Court in front of the Judge about my general condition
        and my general situation.

*Id*. at 118–119.

In his oral decision at the June 30 hearing, the IJ denied Mr. Ismaiel's application for asylum because he had failed to file an asylum application within one year of the date of his arrival in the United States.  As to the claims for restriction on removal and relief under the CAT, the IJ determined that Mr. Ismaiel's testimony regarding the torture incidents was not credible because the asylum application did not mention anything about Mr. Ismaiel's having been interrogated and beaten on two occasions in Syria and his supplemental letters did not indicate that he had been harmed when called into the Intelligence Office. The IJ concluded that Mr. Ismaiel "either fabricated these incidents or ha[d] seriously embellished them." *Id*. at 58.  In addition, the IJ found unpersuasive Mr. Ismaiel's explanation for why he would be targeted in Syria:

> [Mr. Ismaiel] alleges that he had applied for some form of public
> housing and had waited a significant length of time and was not
> granted the house, and [he] testified that because he complained
> about that he was targeted for mistreatment by the government.  It
> seems unlikely that [Mr. Ismaiel] would have been targeted for
> serious mistreatment because of complaining about his failure to
> obtain some public housing.  As [he] explained, public services and
> other items are in short supply in Syria and it's common to wait for

long periods of time. [He] explained that it took him 12 years to obtain a telephone line, it took him 13 years to obtain a car. Accordingly, the Court finds that [Mr. Ismaiel] has not shown by reliable evidence any reason why he would be targeted by the government of Syria. As he pointed out in his testimony he has never publicly expressed any political opinion in any form and it seems extremely unlikely that [he] would be targeted for mistreatment on account of his political opinion as he claims.

*Id*. at 58–59. The IJ found that Mr. Ismaiel had not satisfied his burden of proving a probability that he would be persecuted or tortured if returned to Syria. It denied restriction-on-removal and relief under the CAT, but granted voluntary departure for August 29, 2005. *See* 8 U.S.C. 1229c (Attorney General may permit alien to depart voluntarily at alien's expense rather than be deported.)

Mr. Ismaiel timely appealed to the BIA. The BIA dismissed Mr. Ismaiel's appeal, determining that "major omissions and contradictions in the evidence" supported the IJ's adverse credibility ruling. The BIA also noted that Mr. Ismaiel's adult children and brother remain in Syria, apparently without being harmed, and "[a] claim to fear of future persecution is diminished when family members remain behind and have not experienced persecution." R. at 3.

## II. DISCUSSION

### A. Restriction on Removal and Relief Under the CAT

As we stated in *Wiransane*:

An alien who fears persecution if returned to a particular country has two possible means of relief under the INA: asylum and restriction on removal. A grant of asylum permits the alien to remain in this

country; a restriction on removal forbids removal of the alien to the country where persecution may occur.

366 F.3d at 892–93 (footnote and citation omitted). Although a grant of asylum is in the discretion of the Attorney General, restriction on removal is granted to qualified aliens as a matter of right. *See id*. at 893. An additional avenue for relief is protection under the CAT, which prohibits removal to a country where an alien would probably face torture. *See Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). Relief under the CAT is mandatory if the convention's criteria are satisfied. *See* 8 C.F.R. § 1208.16(c)(4) (an alien meeting the CAT's criteria "shall be granted" withholding of removal or, at a minimum, deferral of removal). Because Mr. Ismaiel does not challenge denial of asylum, we limit our review to the denial of restriction on removal and relief under the CAT.

To obtain a restriction on removal, an applicant must show that his "life or freedom would be threatened in [the proposed country of removal] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see* 8 C.F.R. § 1208.16(b). If an applicant has suffered past persecution for any of the stated reasons, "it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1)(I); *see Niang*, 422 F.3d at 1195–96. Protection under the CAT does not depend on a showing that mistreatment would be based on any particular

-10-

characteristic such as race or political opinion. *See Cruz-Funez v. Gonzales*, 406

F.3d 1187, 1192 (10th Cir. 2005). Rather, an alien seeking such relief must show

that "it is more likely than not that he or she would be tortured if removed to the

proposed country of removal." 8 C.F.R. § 1208.16(c)(2).[4]

## B. Standard of Review

"The agency's findings of fact are conclusive unless the record

demonstrates that 'any reasonable adjudicator would be compelled to conclude to

the contrary.'" *Yan v. Gonzales*, 438 F.3d 1249, 1251 (10th Cir. 2006) (quoting

8 U.S.C. § 1252(b)(4)(B)).[5] We have stated that "our duty is to guarantee that

factual determinations are supported by reasonable, substantial and probative

evidence considering the record as a whole." *Elzour*, 378 F.3d at 1150. We do

not question credibility findings that are "substantially reasonable." *Woldemeskel

v. INS*, 257 F.3d 1185, 1192 (10th Cir. 2001). But "[b]ecause an alien's

---

[4] Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (1999).

[5] The Real ID Act of 2005 has supplemented § 1252(b)(4)(B) by limiting circuit-court review of credibility findings. *See* 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C), 1231(b)(3)(C); *Yan*, 438 F.3d at 1251 n.3. The 2005 amendments do not govern this case, however, because they apply only to applications for asylum and other relief filed after May 11, 2005. *See Yan*, 438 F.3d at 1252 n.3.

testimony alone may support an application for withholding of removal or asylum, 8 C.F.R. § 208.13(a), the IJ must give specific, cogent reasons for disbelieving it." *Sviridov v. Ashcroft*, 358 F.3d 722, 727 (10th Cir. 2004) (internal quotation marks omitted). "An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion." *Chaib v. Ashcroft*, 397 F.3d 1273, 1278 (10th Cir. 2005) (internal quotation marks omitted).

The BIA's affirmance of the IJ's decision was in an opinion by a single member of the Board. *See* 8 C.F.R. § 1003.1(e)(5). In that circumstance we "will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). But "when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Id*. at 1204.

### C. Mr. Ismaiel's Claims

#### 1. Denial of Restriction on Removal

We believe that the IJ's credibility determination was eminently reasonable. If the torture on which Mr. Ismaiel bases his claim had actually occurred, it would defy common sense for Mr. Ismaiel, who was assisted by counsel, to omit any mention of it on his application and supplemental letters, particularly when the application explicitly asked for such information.

-12-

Mr. Ismaiel, however, argues that an omission on an application, without more, cannot serve as the basis for an adverse credibility finding, especially when the applicant's testimony does not contradict the information set forth in the application. To support this argument, he relies on decisions by the Second and Ninth Circuits that may be read as distinguishing between (1) false statements and omissions that involve the "heart of the asylum claim" and (2) false statements and omissions relating only to "incidental" matters, and then rejecting adverse-credibility findings based on the latter. *See, e.g.*, *Secaida-Rosales v. INS*, 331 F.3d 297, 308–09 (2d Cir. 2003); *Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir. 1999).

This court, however, has not adopted that approach. In our view, the significance of an omission must be determined by the context, and rigid rules cannot substitute for common sense. Experienced litigators do not limit their challenges to adverse testimony to matters at the heart of the case. Cross-examination often seeks to undermine the witness's credibility by probing into inconsistencies and improbabilities regarding "incidental" matters. A witness who claims to have had a conversation with a particular person may be disbelieved if he cannot describe the house where the conversation allegedly occurred. Defense counsel regularly confront law-enforcement officers with omissions of information in their reports that do not concern the gist of the alleged offense. We assume that these practices continue because jurors are

-13-

sometimes persuaded by the challenges. To be sure, one must be sensitive to the pressures bearing on persons seeking to escape persecution and make allowances for omissions of detail in their early accounts of what befell them. The amount of leeway to grant, however, must depend on the specific circumstances. Here, for example, the omissions are in a typed form prepared with the assistance of counsel almost four years after Mr. Ismaiel entered this country and in letters submitted almost two years after that. The time elapsed since the alleged trauma and the assistance of counsel should reduce the number of omitted items later elicited in testimony. The circumstances of this case readily support an adverse credibility finding. (We also note the congressional directive that credibility determinations should be based on considerations of "the totality of the circumstances . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim," 8 U.S.C. §§ 1158(b)(1)(B)(iii) and 1229a(c)(4)(C); *see* 1231(b)(3)(C), although that directive applies only to applications filed more recently than Mr. Ismaiel's.[6])

---

[6]8 U.S.C. §§ 1158(b)(1)(B)(iii) and 1229a(c)(4)(C) both state (except that § 1229(c)(4)(C) uses the term *the immigration judge* rather than *a trier of fact*):
> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such

(continued...)

-14-

## 2. Denial of Protection Under the CAT

Next, Mr. Ismaiel claims that the BIA erred in ruling that the adverse credibility determination was sufficient to preclude his claim under the CAT. Although he did not challenge the CAT determination in his appeal to the BIA, the BIA sua sponte ruled on the claim, so we have jurisdiction to decide the issue. *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1118–21 (10th Cir. 2007).

Our analysis follows our analysis of the restriction-on-removal issue. Simply put, the IJ and BIA could reasonably refuse to believe Mr. Ismaiel's claims of past torture and, reviewing all the evidence, remain unpersuaded that Mr. Ismaiel had satisfied his burden of proving that he would probably be tortured if returned to Syria. *See Niang*, 422 F.3d at 1202.

## 3. Membership in the Muslim Brotherhood

Mr. Ismaiel contends that this court should remand the case for further proceedings because the BIA and IJ failed to consider his claim that, if deported, he will be imprisoned or tortured by the Syrian government on the mistaken belief

---

[6](...continued)
statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, *without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor*. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

(emphasis added). *See id*. 1231(b)(3)(C). Regarding the effective date of this provision, *see* note 5, *supra*.

-15-

that he is a member of the Muslim Brotherhood.  He further argues that the BIA and IJ failed to consider documentary evidence of systematic torture of members of the Muslim Brotherhood in Syria.

Mr. Ismaiel failed to present these issues in his appeal to the BIA, so we lack jurisdiction over them.  *See Nguyen v. INS*, 991 F.2d 621, 623 n.3 (10th Cir. 1993).  Mr. Ismaiel argues that he "has consistently maintained that the agency failed to fully and fairly evaluate his claims based on the evidence in the record as a whole," and that "[t]hat legal argument encompasses the argument that the agency failed to consider evidence supporting a particular theory."  Aplt. Reply Br. at 11 n.1.  But his notice of appeal to the BIA, and his brief to the BIA, failed to mention the Muslim Brotherhood.  And even if we had jurisdiction, we discern no error.  The BIA is not required to "'write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.'"  *Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987) (quoting *Osuchukwu v. INS*, 744 F.2d 1136, 1142–43 (5th Cir. 1984)).  That standard was satisfied.

## III.  CONCLUSION

We AFFIRM the BIA's dismissal of Mr. Ismaiel's appeal of the IJ's decision.

-16-