FILED
United States Court of Appeals
Tenth Circuit

June 25, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JIAN BO LIN,

   Petitioner,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,*

   Respondent.

No. 08-9563
(Petition for Review)

---

**ORDER AND JUDGMENT**\*\*

---

Before **KELLY**, **McKAY**, and **BRISCOE**, Circuit Judges.

---

   Jian Bo Lin petitions for review of an order of the Board of Immigration

Appeals (BIA or Board) affirming an Immigration Judge's (IJ) denial of his

applications for asylum, restriction on removal, and protection under the

---

\*  Pursuant to Fed. R. App. P. 43(c)(2) Eric H. Holder, Jr. is substituted as
United States Attorney General for Michael B. Mukasey.

\*\*  After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Convention Against Torture (CAT).  We have jurisdiction under 8 U.S.C.

§ 1252(a) and we deny the petition for review.

## *Background*

Mr. Lin is a native and citizen of China. He was arrested after illegally entering the United States from Mexico in September 2005. After removal proceedings were commenced, petitioner conceded removability and requested asylum, restriction on removal, and CAT protection. Petitioner alleged persecution based on his political opinions related to China's population control policies.

## *Mr. Lin's Application and Testimony*

In his asylum application and his testimony, Mr. Lin described the circumstances leading him to leave China. He stated that he was married with one daughter born in June 2003. He explained that he and his wife decided in October 2004 that they would try to have a second child and his wife became pregnant in February 2005. A neighbor reported his wife's pregnancy to the Birth Control Department in April. Another neighbor who worked in that department warned him of the report, and petitioner immediately fled with his wife and daughter to hide at his aunt's house in the city.

According to Mr. Lin, he and his wife were returning from shopping at 10:00 a.m. on May 20, 2005, when they saw representatives of the Birth Control Department (specifically five men and two women) at his aunt's doorway. The officials approached and told petitioner and his wife that they had violated the birth control policy. They pleaded with the officials that having a second baby

was not against the law when their first child was a girl. The birth control officials encircled Mr. Lin and his wife. He shouted to her to run, but she was unable to get away. The officials shoved him to the ground and slapped his face. His wife sat down on the ground and refused to move, but the officials dragged her away as she screamed for help. Petitioner testified that these events happened outside on the asphalt road.

The birth control officials drove petitioner's wife to a hospital where she was forced to have an abortion. Meanwhile, two officials detained petitioner in another car outside of the hospital. About five hours later Mr. Lin was told to leave the car. He ran to the hospital and found his wife, who was laying on a bed and crying very loudly. He and his wife then walked about 10 minutes back to his aunt's house. Petitioner initially testified that they returned to their own home that same day. He later said that they stayed at his aunt's house one or two more days, but then he testified again that they returned home immediately.

Mr. Lin stated that the government fined them $10,000 for violating the birth control policy, but that they refused to pay because they did not have the money and they felt they had paid enough by losing their child. He said that the Birth Control Department continued to harass them when they did not pay. But he also testified that, after notice of the fine was hand delivered to them at their home, they immediately fled to hide at a friend's house. That friend suggested that petitioner should go to the United States where he would be free to have

-4-

children. His friend helped him get a fake passport and he borrowed money from relatives and friends in order to pay a smuggler to assist him in getting a visa and flights to Mexico. He left China in August 2005, while his wife and child stayed behind. He explained that his wife was still recovering from the abortion and his daughter was too small to make the trip. According to Mr. Lin, his wife and daughter are still living in hiding at his friend's house in China.

### *Documentary Evidence*

Mr. Lin submitted a number of documents, including birth certificates; photo identity cards; a marriage certificate; the household register for his mother's house (where he lived with his wife and daughter); his wife's Woman Checkup For Pregnancy card; a May 20, 2005, hospital record indicating his wife underwent abortion surgery for an early pregnancy; a Birth Control Violation Fine Ticket for an early birth; a notice of a fine for giving birth over the quota limit; a letter from petitioner's friend who worked in the Birth Control Department; and an affidavit from his wife.

### *Cross-examination of Mr. Lin*

The government cross-examined Mr. Lin regarding his claim that he and his wife were unaware, before she was pregnant the second time, that under the birth control policy there was a waiting period for having a second child after a first-born daughter. The government's attorney pointed out that his wife stated in her affidavit that they "didn't want to be restricted by the birth control policy,"

which she described as "after one child, insert a birth control ring; after two children, undergo sterilization. If the first child is a girl, can apply to have one more child after five years." Admin. R. at 349. Mr. Lin's wife also stated in her affidavit that a woman was required to have quarterly checkups, "[m]ainly to check if a woman still has the birth control ring or if she is illegally pregnant." *Id.* And his wife indicated that she was puzzled how a neighbor "knew that [she] was planning on an illegal pregnancy." *Id.* Mr. Lin responded only that he had not read his wife's affidavit and therefore had no knowledge of what she said. He continued to assert that neither of them was aware of the waiting period until her second pregnancy. But he admitted that his wife was following the quarterly checkup rule until she became pregnant with a second child.

The government's attorney then asked Mr. Lin about his wife having her birth control ring removed. He had testified that they went to a private hospital where she saw a male doctor, and he provided that doctor's name. In contrast, his wife stated in her affidavit that she "hired a private female doctor to take out [her] birth control ring." *Id.* The government's attorney also asked Mr. Lin why his wife's affidavit seemed to indicate that the birth control officials arrested them inside the aunt's house, while he testified that it happened outside. He said only that his wife fainted during the confrontation and "[s]he didn't know what's going on" or "she forgot." *Id.* at 205, 206. When asked why the ticket and notice documents listed two different reasons for the $10,000 fine, the former indicating

-6-

"[e]arly birth," *id.* at 338, and the latter saying "for giving birth over the quota limit," *id.* at 341, Mr. Lin responded that he didn't know. Petitioner also had no explanation why his wife's affidavit states that he left home alone after they received notice of the fine, while he testified that his wife and daughter went into hiding with him.

On cross examination Mr. Lin was also asked about identification numbers appearing on several of the documents that he submitted. He initially stated that the Chinese personal identification number is similar to a Social Security number, and he testified clearly that this number cannot be changed. But when confronted with evidence that his and his wife's personal identification numbers were not identical in the various documents, petitioner stated, "Because the I.D. card was renewed after 10 years and the new card has a different number." *Id.* at 238. He later asserted that a personal identification number will change each time a document is renewed.

### *Immigration Judge's Decision*

Following Mr. Lin's testimony, the IJ stated that petitioner's application bordered on being frivolous based on the many inconsistencies between his testimony and the other evidence. In an oral decision the IJ found that petitioner was not credible, stating:

> In fact, the Court feels that the [petitioner's] application is full of inconsistencies, that his testimony today was inconsistent in many aspects with his application and with the affidavit of others, including his wife and

-7-

his friend, that are a part of the file. Further, the Court finds that there [are] inconsistencies and problems in the documents themselves in that the identification number of the [petitioner] and his wife change on several of the documents in the file which have been shown to the Court and are a part of the filing before the Court.

*Id.* at 82-83.

The IJ then listed eight specific reasons why he found Mr. Lin not credible: (1) his demeanor—specifically his failure to show any emotion while describing his wife's forced abortion, in contrast with his emotional response to cross-examination about inconsistencies in the evidence; (2) the inconsistencies between petitioner's testimony and his wife's affidavit regarding: (i) whether they were aware of the waiting period for having a second child; (ii) who removed her birth control ring; (iii) where the encounter with Birth Control Department officials took place; and (iv) who went into hiding after they received notice of the fine; (3) the discrepancy between the notice and the ticket documents regarding the nature of their violation of the birth control policy; (4) the internal inconsistency in Mr. Lin's testimony regarding how long they stayed at his aunt's house after his wife's forced abortion; and (5) the inconsistencies in personal identification numbers in the various documents that petitioner submitted, as well as in his testimony regarding whether personal identification numbers ever change.

Having found Mr. Lin's testimony "to be incredible, unbelievable, and implausible," *id.* at 89, the IJ held that he failed to meet his burden of proof to

-8-

show he was entitled to the relief requested in his applications. The IJ further found "that there is absolutely no evidence in the record that the [petitioner] will be tortured if he is returned to China." *Id.* Finally, the IJ denied petitioner's application for voluntary departure.

### *BIA Appeal*

The BIA dismissed Mr. Lin's appeal, affirming the IJ's decision that he lacked credibility "for the reasons specified in the Immigration Judge's decision," *Id.* at 2, and holding that petitioner was therefore not entitled to the relief he requested. The BIA also affirmed the IJ's holding that petitioner failed to show that it is more likely than not that he would be tortured if he returns to China. Finally, the Board rejected Mr. Lin's claim that faulty translation of his testimony violated his due process rights. The Board emphasized that (1) neither petitioner nor his attorney requested a different interpreter during the hearing, (2) he failed to explain why the allegedly faulty translation occurred only during cross-examination, and (3) he pointed to no aspect of the IJ's decision that reflected an incorrect translation. The BIA noted that petitioner based his argument solely on a comment by the IJ in his oral decision that, at one point during cross-examination, petitioner appeared not to understand the interpreter. But Mr. Lin failed to acknowledge the IJ's finding that his demeanor otherwise reflected that he was having trouble answering the questions, rather than difficulty understanding the interpreter.

### *Scope and Standards of Review*

Because a single member of the BIA affirmed the IJ's decision in a brief order, *see* 8 C.F.R. § 1003.1(e)(5), "we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance," *Ismaiel v. Mukasey*, 516 F.3d 1198, 1205 (10th Cir. 2008) (quotation omitted). "But when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Ismaiel*, 516 F.3d at 1205 (quotation omitted).

We review the BIA's legal determinations de novo. *See Lockett v. INS*, 245 F.3d 1126, 1128 (10th Cir. 2001). "The agency's findings of fact are conclusive unless the record demonstrates that 'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Ismaiel*, 516 F.3d at 1204 (quoting 8 U.S.C. § 1252(b)(4)(B)) (further quotation omitted). "We may not weigh the evidence, and we will not question the immigration judge's or BIA's credibility determinations as long as they are substantially reasonable." *Woldemeskel v. INS*, 257 F.3d 1185, 1192 (10th Cir. 2001). But "the IJ must give specific, cogent reasons for disbelieving [an alien's testimony]." *Ismaiel*, 516 F.3d at 1205 (quotation omitted). Finally, we do not have jurisdiction to review issues not raised in Mr. Lin's appeal to the BIA. *See Rivera-Zurita v. INS*, 946 F.2d 118, 120 n.2 (10th Cir. 1991) ("The failure to raise an issue on appeal to the Board

constitutes failure to exhaust administrative remedies with respect to that question and deprives the Court of Appeals of jurisdiction to hear the matter.").

### *Discussion*
### *Mr. Lin's Credibility*

Mr. Lin challenges the BIA's affirmance of the IJ's adverse credibility determination. Because the Board affirmed this finding for the reasons specified in the IJ's decision, we may look to the IJ's more complete explanation of the same grounds. *See Ismaiel*, 516 F.3d at 1205.

Petitioner challenges the BIA's reliance on discrepancies in the personal identification numbers in the documents. He argues that it was not reasonable for the IJ to require corroboration of his explanation that the identification numbers changed when documents were renewed. But petitioner ignores the IJ's finding that his explanation was not credible because it contradicted his previous, unambiguous testimony that personal identification numbers never change. *See* 8 U.S.C. 1158(b)(1)(B)(iii) (providing "a trier of fact may base a credibility determination on . . . the internal consistency of [a] statement"). The IJ was not required to resolve that contradiction by simply accepting Mr. Lin's belated explanation, without any corroboration, for the identification number discrepancies.

Mr. Lin also argues that the BIA erred in relying on discrepancies in the terms used in the documents to describe the nature of his violation of the birth

-11-

control policy. The Board noted that one document refers to an abortion performed for "Early pregnancy," Admin. R. at 335, another says that the type of violation was "Early birth," *id.* at 338, and a third document refers to "the fine for giving birth over the quota limit," *id.* at 341. Petitioner testified that he did not know why varying terms were used in the different documents. He contends, however, that the Board has no knowledge, nor is there any evidence in the record, whether these phrases are truly inconsistent, or are used interchangeably by Chinese officials in this context. We agree. An IJ's credibility finding "may not be based upon speculation, conjecture, or unsupported personal opinion." *Elzour v. Ashcroft*, 378 F.3d 1143, 1153 (10th Cir. 2004) (holding IJ failed to substantiate with support from the record his skepticism regarding the plausibility of alien's story about his treatment by Syrian authorities). But this was only one of numerous bases cited by the BIA for affirming the IJ's adverse credibility determination, and petitioner fails to show that any of the IJ's other findings of inconsistences were not substantially reasonable.[1]

Mr. Lin argues next that, even if there were inconsistencies in the evidence, none of them "go to the heart of Mr. Lin's asylum claim," and they are therefore too minor to support a finding that he was not credible. Pet. Opening Br. at 21.

---

[1] Petitioner challenges other inconsistency findings by the IJ that he did not raise in his BIA appeal. We do not address these unexhausted issues. *See Rivera-Zurita*, 946 F.2d at 120 n.2.

-12-

Petitioner's argument has no merit. The REAL ID Act amended the Immigration and Nationality Act to provide that an IJ may make an adverse credibility determination based upon "the totality of the circumstances . . . *without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor*." 8 U.S.C. §§ 1129a(c)(4)(C) and 1158(b)(1)(B)(iii) (emphasis added). We acknowledged this new "congressional directive" in *Ismaiel*, but did not apply it in that case because the alien filed his application before the effective date of the REAL ID Act. 516 F.3d at 1206. As petitioner acknowledges, yet seemingly ignores, the REAL ID Act amendment applies to his asylum application, which he submitted after May 11, 2005. *See id.* at 1205 n.5.

Moreover, even before the REAL ID Act, this court had not adopted the "heart of the asylum claim" approach to credibility determinations. *See id.* at 1205. We declined to apply such a rigid rule because

> [e]xperienced litigators do not limit their challenges to adverse testimony to matters at the heart of the case. Cross-examination often seeks to undermine the witness's credibility by probing into inconsistencies and improbabilities regarding "incidental" matters. A witness who claims to have had a conversation with a particular person may be disbelieved if he cannot describe the house where the conversation allegedly occurred. Defense counsel regularly confront law-enforcement officers with omissions of information in their reports that do not concern the gist of the alleged offense. We assume that these practices continue because jurors are sometimes persuaded by the challenges. To be sure, one must be sensitive to the pressures bearing on persons seeking to escape persecution and make allowances for omissions of detail in their early accounts of what

-13-

befell them. The amount of leeway to grant, however, must depend on the specific circumstances.

*Id.* at 1205-06. Here the numerous inconsistencies relied upon by the IJ and the Board are not limited to one aspect of the evidence. They include contradictions within Mr. Lin's own testimony, between his testimony and his wife's affidavit, and within the documents that he submitted. And the inconsistencies are not limited to omissions of detail that were later supplemented; rather, they involve contradictory details not satisfactorily explained.

Finally, Mr. Lin agues that the IJ's demeanor finding was speculative and not tied to any inconsistencies in the record. The Board deferred to the IJ's finding that petitioner's lack of emotion in describing the ordeal of his wife's forced abortion, in contrast with his emotional response to being cross-examined about inconsistencies in the evidence, leant further support to his adverse credibility determination. "[A]n IJ may find a witness not to be credible because of his or her testimonial demeanor." *Elzour*, 378 F.3d at 1152-53; *see also* 8 U.S.C. § 1158(b)(1)(B)(iii) (providing credibility determination may be based on applicant's demeanor, while considering the totality of the circumstances). The Board did not err in affirming the IJ's adverse credibility determination based, in part, on the IJ's finding regarding petitioner's testimonial demeanor.[2]

_____

[2]     Mr. Lin argues for the first time in his petition for review that the IJ's demeanor finding is speculative because "Mr. Lin could unconsciously be

(continued...)

-14-

Mr. Lin was given the opportunity to explain the inconsistencies in the evidence he presented, but failed to do so to the IJ's satisfaction. We conclude that the IJ's and the BIA's adverse credibility determinations, based upon those inconsistencies and his testimonial demeanor, were substantially reasonable. *See Diallo v. Gonzales*, 447 F.3d 1274, 1283 (10th Cir. 2006). Nor can we say that the BIA's conclusion that petitioner failed to satisfy his burden of proof to establish eligibility for the relief he requested "was contrary to what a reasonable factfinder would have been compelled to conclude." *Id.* (quotation omitted).

### *Inadequate Translation*

Mr. Lin argues that the Board erred in failing to grant a new hearing because his testimony was not adequately translated. He points out instances in the transcript where the interpreter asked for statements to be repeated or clarified; where the interpreter failed to translate his responses; where he appeared to not understand a question; and one incorrect translation that was immediately corrected on the record. The BIA noted that petitioner did not raise any objection to the interpreter or the translation during the hearing. Nor did he bring any of these specific instances of translation problems to the attention of the

---

[2](...continued)
protecting himself from breaking down at the memory of his wife being dragged away by cadres." Pet. Opening Br. at 20. Once again, we do not have jurisdiction to consider this unexhausted claim. *See Rivera-Zurita*, 946 F.2d at 120 n.2.

BIA in his appeal. Petitioner does not identify a single mistranslated word or unresponsive answer in the transcript that bears upon the specific evidentiary inconsistencies relied upon by the BIA in affirming the IJ's credibility determination. We conclude that Mr. Lin fails to establish that the translation of his testimony at the hearing was constitutionally inadequate. *See Hadjimehdigholi v. INS*, 49 F.3d 642, 650 (10th Cir. 1995) ("While the transcript of the hearing indicates that the interpreter's translation was often less than perfect, there is no indication that petitioner was unfairly prejudiced or prevented from presenting his case.").

### *Conclusion*

The petition for review is DENIED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge