FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**January 11, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

ABDALLAH KARIM,

    Petitioner,

v.

MERRICK B. GARLAND, United States
Attorney General,

    Respondent.

No. 22-9507
(Petition for Review)

_____

## ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, Chief Judge, **HARTZ**, and **ROSSMAN**, Circuit Judges.
_____

Abdallah Karim, a native and citizen of Ghana, petitions for review of a Board

of Immigration Appeals' (BIA) decision affirming an immigration judge's (IJ) denial

of asylum, restriction on removal, and protection under the Convention Against

Torture (CAT).  The IJ denied relief after finding Mr. Karim's testimony was not

credible.  The BIA dismissed his appeal.  Exercising jurisdiction under 8 U.S.C.

§ 1252(a)(1), we deny the petition for review.  As explained below, the adverse

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

credibility finding is supported by substantial evidence revealing inconsistencies, not only between Mr. Karim's testimony and the documentary evidence, but also in his explanations attempting to reconcile those discrepancies.

I

Mr. Karim entered the United States on August 16, 2011, and surrendered to Customs and Border Protection (CBP) officers. The next day, he gave a sworn statement, indicating he spoke English and understood he could be subject to civil and criminal penalties for failing to tell the truth. Further, he swore his answers were true and complete.

In his sworn statement, Mr. Karim indicated he is a Sunni Muslim who was born in Ghana. He said he had four brothers and sisters and fled Ghana because he was being threatened by a group called the "Land Guard." Admin. R. at 286. He stated the Land Guard wanted to kill him and they had tortured his brother.

The government charged Mr. Karim with being removable as a noncitizen who lacked valid entry documents at the time of his application for admission to the United States. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). He conceded the charge, but applied for asylum, restriction on removal, and CAT relief. He claimed to fear harm in Ghana based on his political opinion for exposing the Land Guard's corrupt activities.

During removal proceedings, Mr. Karim appeared before an IJ with counsel and indicated his "best language" was English. Admin. R. at 76. However, he later appeared for another hearing with counsel and requested an interpreter, indicating he

spoke English but his "best language [was] Hausa," *id.* at 90. Ultimately, the IJ conducted Mr. Karim's merits hearing through an interpreter, although at one point, his counsel paused to remind him to speak in Hausa rather than English. *Id.* at 194.

During his merits hearing, Mr. Karim testified that the Land Guard is a group in Ghana hired by local chiefs to fight over land that does not belong to them. He first spoke out against the Land Guard in September 2010 at a "lorry park," "where taxis come and . . . transport people around [the] area[.]" *Id.* at 152. He twice spoke at the lorry park, the second time before a crowd of forty to fifty people. The Land Guard had been recruiting young men, telling them the Land Guard's work was not dangerous. But Mr. Karim told the men the Land Guard was lying to them and they should resist their recruitment efforts. He told the crowd the Land Guard was responsible for killing two police officers, and he reminded them that their Muslim faith forbade the Land Guard's activities.

Mr. Karim further testified that after his second speech at the lorry park, four or five members of the Land Guard followed him as he walked home. They accused him of exposing their activities, which they told him were none of his business. One of the men struck Mr. Karim on the back of his right shoulder with a stick decorated with metal. When he turned to confront the man, another man stabbed him in the abdomen with a pocketknife. Mr. Karim screamed for help and fell unconscious. He regained consciousness at a hospital and discovered his stab wound had been treated and stitched. He submitted into evidence a hospital record documenting the stabbing.

3

On cross-examination, the government questioned Mr. Karim about several inconsistencies and omissions in his testimony. The government noted his testimony that he was stabbed after giving a public speech about the Land Guard at a lorry park differed from his hospital record, which indicated he reported being "attacked by [a] mob at a mosque during a preaching session," *id.* at 572. Mr. Karim explained that he falsely told the hospital staff he was attacked at a mosque during a preaching session because he knew the hospital gave more attention to "anything that involved religious conflict or religious violence." *Id.* at 215. He stated he wanted to ensure he received the necessary medical attention and if he had told them he was attacked by a mob on his way home, the hospital staff would start asking questions that could delay treatment. The government pointed out, however, that an affidavit from Mr. Karim's friend, Ahmed Abubakar, indicated he had been attacked by a mob while preaching about Islamic fundamentalism. *See id.*; *see also id.* at 574 (Abubakar aff., Apr. 3, 2012). Mr. Karim replied that his speech tried to relate the Land Guard's activities to Islamic fundamentalism. He further testified that if he had not told the hospital he was attacked at a mosque, they might have denied him treatment. The IJ later asked why he would have been concerned with getting treatment if his stab wound had already been stitched, to which Mr. Karim replied he thought he might need additional treatment.

The government also questioned why Mr. Karim's sworn statement to the CBP officer indicated he had four brothers and sisters, yet his amended asylum application listed only two sisters. Mr. Karim explained he has two sisters, and he listed two

extended family members as brothers.  He identified his cousin, Suleman Karim, as a brother because they are very close.  The government asked which brother he claimed had been tortured and why he omitted any mention of the alleged torture from his direct testimony.  Mr. Karim replied that he was referring to Suleman, whom his mother had incorrectly told him had been tortured.  He explained that "older folks give narratives," *id.* at 211, and "she was just trying to say all sort[s] of things to me," *id.* at 213.  He testified that when he spoke to Suleman, however, Suleman clarified that he had not been tortured, only threatened.  On redirect, Mr. Karim's attorney asked what specifically his mother told him that made him think Suleman had been tortured.  Mr. Karim testified that she told him the Land Guard "came and threatened your brother," saying they would do to Suleman what they had done to him, which he understood to mean "an attack."  *Id.* at 227.

Following the hearing, Mr. Karim submitted a second affidavit from his friend, Ahmed Abubakar, and an affidavit from his cousin Suleman.  These affidavits ostensibly attempted to reconcile some of the discrepancies between Mr. Karim's testimony and the documentary evidence.  Ahmed Abubakar's second affidavit indicated Mr. Karim "was attacked by an unknown mob/gang" while "he was preaching at a small mosque at the . . . lorry station against Islamic Fundamentalism and illegal activities of land guards."  *Id.* at 265 (Abubakar aff., Oct. 24, 2018).  Suleman's affidavit indicated he attended Mr. Karim's "public sermon" about "the menace of land-guards" and "youth fleeing to join terrorist[] groups in neighboring West African countries."  *Id.* at 268 (Suleman Karim aff., Aug. 28, 2018).  It further

5

indicated the public sermon was at a "lorry station" and "market square/mosque," and after Suleman left, he learned Mr. Karim had been "attacked by a section of angry Land-guard." *Id.*

The IJ admitted these additional affidavits but found "[g]laring discrepancies" between Mr. Karim's testimony and the documentary evidence he provided to substantiate "the central event of harm in his story." *Id.* at 71. In particular, the IJ pointed out the difference between, on one hand, Mr. Karim's testimony that he had been attacked and stabbed by four or five members of the Land Guard after speaking out against them at the lorry park, and on the other hand, his hospital record, which indicated he had been attacked by a mob while preaching at a mosque. The IJ acknowledged Mr. Karim admitted lying to the hospital to obtain quicker, better treatment. But the IJ found this explanation dubious because Ahmed Abubakar's first affidavit indicated Mr. Karim actually had been attacked by a mob or a gang while preaching about Islamic fundamentalism. The IJ recognized Mr. Karim attempted to reconcile the discrepancy by providing the additional affidavits from Ahmed Abubakar and Suleman, but the IJ noted the additional affidavits were filed after the hearing where the discrepancies were scrutinized. The IJ acknowledged it was possible Mr. Karim's speech about the Land Guard included religious components, but the IJ questioned why he would not have simply said it included religious components when confronted with the discrepancy between his testimony and the medical record. Instead, the IJ observed, Mr. Karim testified that he

fabricated the religious component to obtain faster, better treatment. The IJ found the affidavits did not rehabilitate this conflicting explanation.

The IJ cited other inconsistences as well. The IJ questioned why Mr. Karim testified that he fabricated the story about being attacked at a mosque to receive treatment when he already had been treated. The IJ recognized he thought he might need additional treatment, but the IJ found that explanation unpersuasive and did not resolve the inconsistency with the additional affidavits, which indicated he had been preaching, at least in part, about religion at a mosque.

The IJ also mentioned inconsistencies between Mr. Karim's testimony and the sworn statement he gave to the CBP officer. While Mr. Karim's sworn statement indicated his brother had been tortured, the IJ observed, Mr. Karim testified on cross-examination that his cousin, not his brother, was threatened, not tortured. The IJ acknowledged Mr. Karim's explanations about referring to his cousin Suleman as his brother and being misinformed by his mother that Suleman was tortured. But the IJ found that, rather than clarify the discrepancies, Mr. Karim changed his testimony on redirect by stating his mother told him Suleman had merely been threatened.

Based on these inconsistencies, the IJ found Mr. Karim was not credible and determined the other evidence failed to satisfy the standards for asylum or restriction on removal. Likewise, the IJ concluded Mr. Karim's failure to present credible evidence of torture precluded his CAT claim. Accordingly, the IJ denied relief and ordered him removed to Ghana. The BIA upheld the adverse credibility finding,

concluded the other evidence failed to satisfy the standards for relief, and dismissed the appeal. Mr. Karim now seeks review.

## II

### A. Standards for Relief

To obtain asylum, an applicant must establish they are a "refugee" as defined by 8 U.S.C. § 1101(a)(42), and then obtain a discretionary grant of relief. *See* 8 U.S.C. § 1158(b)(1)(A); *Diallo v. Gonzales*, 447 F.3d 1274, 1282 n.4 (10th Cir. 2006). "To obtain . . . restriction on removal, an applicant must show that his [or her] 'life or freedom would be threatened in the proposed country of removal because of [their] race, religion, nationality, membership in a particular social group, or political opinion.'" *Ismaiel v. Mukasey*, 516 F.3d 1198, 1204 (10th Cir. 2008) (brackets omitted) (quoting 8 U.S.C. § 1231(b)(3)(A)). And to obtain CAT relief, an applicant must demonstrate "'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Id.* (quoting 8 C.F.R. § 1208.16(c)(2)). The burden of proof necessary to satisfy all three standards may be satisfied by an applicant's credible testimony alone. *See* 8 U.S.C. § 1158(b)(1)(B)(ii) (asylum); *id.* § 1231(b)(3)(C) (restriction on removal); 8 C.F.R. § 1208.16(c)(2) (CAT relief).

### B. Standard of Review

"This court reviews the BIA's legal determinations de novo and its factual findings under a substantial-evidence standard." *Igiebor v. Barr*, 981 F.3d 1123, 1131 (10th Cir. 2020) (brackets and internal quotation marks omitted). "Credibility

8

determinations are factual findings . . . subject to the substantial evidence test." *Id.* at 1132 (internal quotation marks omitted). The Supreme Court has instructed "that a reviewing court must accept 'administrative findings' as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021) (quoting 8 U.S.C. § 1252(b)(4)(B)). "This is a highly deferential standard." *Id.* (internal quotation marks omitted). "Under this standard, we do not weigh evidence or independently assess credibility; rather, even if we disagree with the BIA's conclusions, we will not reverse if they are supported by substantial evidence and are substantially reasonable." *Htun v. Lynch*, 818 F.3d 1111, 1119 (10th Cir. 2016) (brackets and internal quotation marks omitted).

Where, as here, the BIA issues an opinion by a single member affirming the IJ, "we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). "However, when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Id.*

### C. Discussion

Based on the record before us, we cannot say any reasonable adjudicator would be compelled to find Mr. Karim credible. We note Mr. Karim's hospital record appears to substantiate his allegation that he was stabbed for making some sort

9

of public pronouncement.[1]  Nonetheless, the BIA determined there was no clear error in the IJ's adverse credibility finding, which was predicated on specific, cogent reasons.  Prime among them, the BIA recognized, was that his testimony that he was attacked after speaking out against the Land Guard at the lorry park was inconsistent with his hospital record, which indicated he reported being attacked by a mob while preaching at a mosque.  This was a permissible basis for discounting Mr. Karim's credibility under the applicable legal standards.  *See Niang v. Gonzales*, 422 F.3d 1187, 1193, 1201 (10th Cir. 2005) (upholding adverse credibility finding based in part on discrepancy between noncitizen's testimony regarding her age when she was attacked and a letter from her doctor indicating noncitizen reported she was a different age at the time she was attacked).  Although Mr. Karim tried to explain he fabricated the story about being attacked while preaching at a mosque, the BIA recognized this explanation conflicted with Ahmed Abubakar's first affidavit, which indicated Mr. Karim actually had been preaching about Islamic fundamentalism. This is substantial evidence supporting the adverse credibility determination.  *See Igiebor*, 981 F.3d at 1135 (concluding that adverse credibility finding was supported by substantial evidence because noncitizen's explanation "only created further questions as to his honesty").

---

[1] The government does not specifically dispute Mr. Karim was beaten and stabbed, but it does argue that because he was found "to be not credible, his testimony and statements in the record should be treated as allegations."  Resp. Br. at 2.  The government's argument does not question the hospital record, which indicates he was treated for a stab wound sustained while making a public pronouncement.

Still, Mr. Karim maintains he was speaking about *both* the Land Guard *and* religion when he was attacked, which he says is corroborated by the additional post-hearing affidavits he submitted from Ahmed Abubakar and Suleman. He points out the IJ gave these affidavits full weight, but he contends the IJ rejected them without giving specific, cogent reasons for doing so. The record shows otherwise, however. As the BIA explained, the IJ gave full weight to the affidavits, which indicated Mr. Karim had been speaking about the Land Guard and religion at a mosque located at a lorry park. The IJ acknowledged these affidavits might have resolved some inconsistencies, but they did not reconcile Mr. Karim's explanation that he fabricated the religious aspect of his story to obtain faster, better treatment at the hospital. Indeed, contrary to his explanation that he fabricated the religious aspect of his story, the affidavits indicate his speech *did* compare the Land Guard to religious fundamentalists. The affidavits thus support the adverse credibility finding.

Mr. Karim also contends the IJ provided deficient reasoning for rejecting his explanation that he fabricated the religious aspect of his story to ensure he received better, faster treatment. But the IJ pointed out Mr. Karim had already received stitches and his explanation that he thought he might need additional treatment was unpersuasive. The BIA determined the IJ did not clearly err in rejecting this explanation. *See Kabba v. Mukasey*, 530 F.3d 1239, 1245-46 (10th Cir. 2008) (recognizing the BIA reviews an IJ's credibility findings for clear error and "where there are two permissible views of the evidence, . . . the factfinder's choice between them cannot be clearly erroneous" (internal quotation marks omitted)). Given

11

Mr. Karim's conflicting explanations, "[a] reasonable adjudicator would not be compelled to find [him] credible," *Htun*, 818 F.3d at 1120, because the record demonstrated a sound basis for discounting his credibility. *See Chaib v. Ashcroft*, 397 F.3d 1273, 1278 (10th Cir. 2005) ("A proper incredibility determination can be based on inherent inconsistencies in the applicant's testimony, lack of detail, or implausibility of the applicant's story[.]").

Next, Mr. Karim faults the IJ's analysis of the sworn statement he gave to the CBP officer. Although Mr. Karim acknowledges his sworn statement indicated his brother was tortured, he says he adequately explained this mistake based on faulty information provided by his mother. Mr. Karim contends he clarified on cross-examination that Suleman, his cousin, had been threatened, not tortured, so he omitted the torture allegation from his direct testimony. He therefore insists these discrepancies do not support discrediting him.

To the extent Mr. Karim asks us to reweigh the adequacy of his explanations, we cannot do so. *See Htun*, 818 F.3d at 1119. To the extent he contends the BIA improperly rejected his explanations, we disagree. The inconsistencies cited by the BIA—that Mr. Karim's sworn statement indicated his brother had been tortured when it was his cousin who had only been threatened—were substantial evidence supporting the adverse credibility finding.

Moreover, the BIA observed that when the government asked Mr. Karim about why he did not mention his brother being tortured, he replied, "it was my mother who told me that," Admin. R. at 210, meaning Mr. Karim's mother told him Suleman had

12

been tortured. Yet on redirect, Mr. Karim testified his mother told him the Land Guard "came and *threatened* your brother," saying they would do to Suleman what they had done to him. *Id.* at 227 (emphasis added). Noting this changing testimony, the IJ observed Mr. Karim initially testified his mother told him Suleman had been tortured, but on redirect testified she told him Suleman had been threatened. Mr. Karim insists he simply misunderstood his mother, and even if we agreed, we may not reweigh the evidence of his credibility, which is what Mr. Karim asks us to do. *See Htun*, 818 F.3d at 1119. Applying the deferential standard of review, we conclude Mr. Karim's shifting testimony supported the adverse credibility determination because it exemplifies how his efforts to explain the omission "only created further questions as to his honesty," *Igiebor*, 981 F.3d at 1135.

Mr. Karim also challenges the reliability of his sworn statement, arguing that the CBP interview was informal and conducted in English. The BIA rejected this argument, and so do we. As an initial matter, we reject Mr. Karim's premise that the adverse credibility finding was predicated simply on inconsistencies between his sworn statement and his testimony. The foregoing discussion demonstrates the adverse credibility finding was based, not simply on inconsistencies between the sworn statement and Mr. Karim's testimony, but critically, on his failed attempts to explain those inconsistencies.

In any event, there is no indication the CBP interview and Mr. Karim's sworn statement were unreliable. Mr. Karim points out that Hausa is his native language but the CBP interview was conducted in English. Yet he told an IJ at a preliminary

13

hearing that English was his best language. And while Mr. Karim later stated Hausa was his best language, his attorney had to remind him during his merits hearing to speak in Hausa rather than English. Moreover, the record confirms that, as the BIA observed, Mr. Karim's sworn statement bore sufficient indicia of reliability. Indeed, it was administered by the CBP officer, who advised Mr. Karim that it was very important to tell the truth because he could be subject to civil or criminal penalties or barred from receiving immigration benefits if he gave false information. Mr. Karim indicated he understood what the officer said to him, and he swore that his responses were true and complete. He then answered the officer's questions. We discern nothing in this evidence to suggest any language barriers or comprehension difficulties, and nothing about the CBP interview or Mr. Karim's sworn statement undermines the agency's adverse credibility finding.

Apart from challenging the adverse credibility finding, Mr. Karim contends the IJ inadequately explained what other evidence in the record, independent of his testimony, she considered in concluding that he failed to satisfy the standards for asylum and restriction on removal. Both the IJ and the BIA stated, however, that the IJ considered all the record evidence, even if it was not specifically discussed. "The BIA is not required to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Ismaiel*, 516 F.3d at 1207 (internal quotation marks omitted). We must ask whether the BIA's decision is sufficient to permit our meaningful review, and here,

14

we are satisfied it is. The agency appropriately considered the record evidence in concluding Mr. Karim failed to satisfy the standards for asylum and restriction on removal.

Finally, Mr. Karim challenges the denial of CAT relief based on what he says is the unsupported adverse credibility finding, but our disposition upholding that finding defeats his argument. *See id.* at 1206 ("[T]he IJ and BIA could reasonably refuse to believe [the noncitizen's] claims of past torture and, reviewing all the evidence, remain unpersuaded that [he] satisfied his burden of proving that he would probably be tortured if [removed].").

## III

Accordingly, the petition for review is denied.

Entered for the Court


Veronica S. Rossman
Circuit Judge