FILED
United States Court of Appeals
Tenth Circuit

December 7, 2020

Christopher M. Wolpert
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

ESEOS OSA IGIEBOR,

     Petitioner,

v.

WILLIAM P. BARR, United States
Attorney General,

     Respondent.

No. 19-9579

---

**On Petition for Review of an Order of the
Board of Immigration Appeals**

---

Submitted on the briefs:[*]

Michael E. Ward, Alston & Bird LLP, Washington, D.C., on the briefs for
Petitioner.

Joseph H. Hunt, Assistant Attorney General; Ethan P. Davis, Acting Assistant
Attorney General; Jeffrey Bossert, Acting Assistant Attorney General; John S.
Hogan, Assistant Director; John W. Blakeley, Assistant Director; Laura M.L.
Maroldy, Trial Attorney; Christina R. Zeidan, Trial Attorney; W. Manning Evans,
Sr. Litigation Counsel; Office of Immigration Litigation, Civil Division, United
States Department of Justice, Washington, D.C., on the briefs for Respondent.

---

    [*]After examining the parties' briefs and the administrative record, this
panel determined unanimously that oral argument would not materially assist in
the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R.
34.1(G). Accordingly, on October 27, 2020, this court entered an order
submitting the petition without oral argument.

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Eseos Igiebor, a citizen and native of Nigeria, entered the United States as a visitor in 1998. He became a lawful permanent resident ("LPR") in 2004. In 2014, he pleaded guilty to (1) aggravated identity theft, 18 U.S.C. §§ 2, 1028A and (2) conspiracy to commit wire fraud, mail fraud, and bank fraud, *id.* §§ 1341, 1343, 1344, 1349. He was sentenced to ninety-six months' imprisonment and ordered to pay restitution. The Department of Homeland Security ("DHS") initiated removal proceedings against Igiebor in 2018.[1] Igiebor conceded removability, but sought deferral of removal pursuant to the Convention Against Torture ("CAT"). *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16–1208.18. He asserted that due to his status as a homosexual, he would be tortured if removed to Nigeria. An immigration judge ("IJ") concluded Igiebor's testimony was not credible and found Igiebor failed to show it is more likely than not he would be

---

[1]*See* 8 U.S.C. § 1227(a)(2)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); *id.* § 1101(a)(43)(M), (a)(43)(U) (providing that the term "aggravated felony" includes fraud or deceit offenses, as well as conspiracies to commit such offenses, where the loss to the victim, including the government, exceeds $10,000).

tortured if returned to Nigeria.  The Bureau of Immigration Appeals ("BIA") determined the IJ did not commit clear error in finding Igiebor not credible and, given that adverse credibility determination, the IJ correctly found Igiebor did not carry his burden of proving it was more likely than not he would be tortured if returned to Nigeria.  Igiebor petitions for review, challenging several aspects of the BIA's decision.

This court has jurisdiction to reach the merits of Igiebor's petition. Although he was removed to Nigeria during the pendency of this appeal, Immigration and Customs Enforcement ("ICE") has made clear, through its Facilitation of Return Policy, ICE Policy Directive 11061.1 (Feb. 24, 2012), it would facilitate Igiebor's return to the United States should he succeed before this court.  Furthermore, the Supreme Court recently held that the jurisdictional bar set out in 8 U.S.C. § 1252(a)(2)(C)–(D) does not apply to final orders denying CAT relief.  *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020).  On the merits, we conclude Igiebor has failed to identify any legal or factual error on the part of the BIA.  Thus, exercising jurisdiction pursuant to 8 U.S.C. § 1252(b)(4), this court **denies** Igiebor's petition for review.

## II.  BACKGROUND

Igiebor entered the United States in 1998.  He married Rebecca Warner in 1999.  Shortly after the birth of their child, they separated.  He became an LPR in

2004.  In 2014, Igiebor pleaded guilty to aggravated identity theft and conspiracy to commit wire fraud, mail fraud, and bank fraud.  The court sentenced him to ninety-six months in prison and ordered him to pay $9,660,658.17 in restitution to the Internal Revenue Service.  In 2018, DHS initiated removal proceedings against Igiebor based on these aggravated felony convictions.  *See supra* n.1.  He conceded his removability, but sought relief in the form of, *inter alia*, deferral of removal under CAT based on his sexual orientation.

Igiebor proceeded pro se in his application for deferral of removal and in testifying before the IJ.  In his application, he stated he was severely beaten and tortured because of his sexual orientation the last time he was in Nigeria.  Igiebor explained he returned to Nigeria in 2006 for his father's burial.  While he was there, Igiebor alleged he sought comfort from another man, Victor Fosa.  After villagers saw the two men holding hands and kissing, Igiebor claimed they attacked the pair because "homosexuality is seen as an abomination in Nigeria."  When police arrived, they allegedly took Igiebor and Fosa into custody and, thereafter, stripped Igiebor naked and tortured him by denying him food and medical attention, beating him with a baton, and whipping him with a horse whip.  Igiebor stated his mother bonded him out of custody after two days and took him and Fosa to the hospital.  According to Igiebor, Fosa died a short time later.

After receiving medical treatment, Igiebor returned to the United States when he heard a judge had issued an arrest warrant for him due to his sexual orientation.

In his hearing before the IJ, Igiebor testified to these same events, but added significant additional information. He testified, for example, that the police brought Fosa into his cell and directed the men to "face each other and start making out." He also claimed police tied a rope around his and Fosa's penises and ordered them to pull on each other's rope while the police laughed and made fun of them. Likewise, Igiebor testified about significant mistreatment his mother allegedly suffered at the hands of her family because she had aided him after the 2006 incident. As was true of other details bearing on conditions he alleged he would face if returned to Nigeria, these new facts were not included in Igiebor's application for deferral of removal. Igiebor asserted he omitted these details from his application because he is illiterate and someone helped him fill out his paperwork.

Igiebor brought corroborating documents to court, including letters from friends and family attesting to his sexual orientation; photographs of scars from a beating; a medical record relating to his 2006 detention; an extract from a record of the Nigerian police force; and an affidavit by a Nigerian village chief regarding the 2006 incident, Igiebor's "wanted" status with the Nigerian government and police force, and the dangers Igiebor faces in Nigeria. The IJ accepted most of

the documents into evidence but excluded, at the request of the government, two

of the three documents set out at Exhibit 9 of Igiebor's application. The IJ

excluded for lack of authentication, pursuant to 8 C.F.R. § 1287.6, a record from

the Nigerian police force and a medical record. At the hearing, the IJ also

excluded the third document in Exhibit 9, an affidavit from the chief of Igiebor's

community, on this same basis. In its oral decision, however, the IJ admitted the

chief's affidavit, deemed it "not reliable," and concluded it had "little evidentiary

value, if any."

The IJ denied Igiebor's request for deferral of removal. The IJ determined

Igiebor was not credible because of inconsistencies and omissions in his

application, testimony, and documentation. The IJ discounted the corroborating

evidence submitted by Igiebor and explained why the excluded evidence would

not have been persuasive even if it had been admitted. The IJ concluded Igiebor

failed to prove it is more likely than not he would be tortured if returned to

Nigeria. Igiebor, with the assistance of pro bono counsel, appealed to the BIA.

He argued as follows in his brief before the BIA: (1) the IJ's adverse credibility

finding was clearly erroneous; (2) the IJ erred in excluding or discounting the

corroborating evidence he submitted; and (3) he established eligibility for deferral

of removal under CAT because of his sexual orientation. The BIA dismissed

Igiebor's appeal, thereby upholding the IJ's denial of relief. In so doing, the BIA

concluded the IJ's adverse credibility determination was well-supported by the record and, when combined with the absence of meaningful evidence in corroboration, the adverse credibility determination left the record devoid of evidence necessary for Igiebor to carry his burden of showing the likelihood he would be tortured if removed to Nigeria.

Represented by new counsel, Igiebor filed a petition for review in the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit transferred the petition to this court because Igiebor's immigration proceedings were completed in Okmulgee, Oklahoma. *See* 8 U.S.C. § 1252(b)(2). While Igiebor's petition for review was pending in this court, he moved for a stay of removal. This court denied the request for a stay and Igiebor was removed to Nigeria on December 10, 2019.

## III. ANALYSIS

### A. CAT

CAT was implemented by the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231, United States Policy with Respect to the Involuntary Return of Persons in Danger of Subjection to Torture). *See generally Nasrallah*, 140 S. Ct. at 1690 (discussing FARRA and CAT). CAT "prohibits removal to a country where an alien would

-7-

probably face torture." *Ismaiel v. Mukasey*, 516 F.3d 1198, 1204 (10th Cir. 2008). "Relief under the CAT is mandatory if the convention's criteria are satisfied." *Id.*; *see also* 8 C.F.R. § 1208.16(c)(4) (providing that an alien meeting CAT's criteria "shall be granted," at a minimum, deferral of removal). "A claim under CAT differs from a claim for asylum or withholding of removal under the INA [Immigration and Nationality Act] because there is no requirement that the petitioner[] show that torture will occur on account of a statutorily protected ground." *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005).

CAT's implementing regulations are found at 8 C.F.R. §§ 1208.16–1208.18. To be entitled to any type of CAT relief, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* § 1208.16(c)(2). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." *Id.* § 1202.18(a)(2); *see also generally id.* § 1208.18(a) (defining torture). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." *Id.* § 1208.16(c)(2); *see also* 8 U.S.C. §§ 1158(b)(1)(B), 1231(3)(C). Because of Igiebor's criminal history of aggravated felonies, the only kind of CAT relief available to him is deferral of removal. *See* 8 U.S.C. § 1231(b)(3)(B); 8 C.F.R. §§ 1208.16(c)(4), (d), 1208.17.

**B. Jurisdiction**

**1. Mootness**

As noted above, during the pendency of this petition for review, Igiebor was removed to Nigeria. In light of that fact, this court ordered the parties to file supplemental briefs addressing the following question:

> The record in this case reveals [Igiebor] was removed to Nigeria on December 10, 2019. The record further reveals that in his removal proceedings, Igiebor conceded his removability under 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien who, any time after admission, has been convicted of an aggravated felony. Thus, Igiebor is banned from reentry, 8 U.S.C. § 1182(a)(9)(ii), and is also inadmissible, *id.* § 1182(a)(2). Igiebor is not eligible for a waiver of inadmissibility. 8 U.S.C. § 1182(h). Furthermore, the instant petition for review challenges only the denial of Igiebor's CAT-based request for deferral of removal. That is, it does not appear success on the merits of the instant petition would have any effect on Igiebor's future admissibility to the United States. Instead, even if he were to succeed on review in this court, his ability to return to finish litigating his CAT-based claim for deferral of removal appears to depend entirely on whether United States immigration officials would, as a discretionary matter, allow Igiebor to return to the United States. *See Del Cid Marroquin v. Lynch*, 823 F.3d 933, 936 (9th Cir. 2016). The question then arises whether this case is moot. *See id.*

The parties filed helpful supplemental briefs. A review of those briefs demonstrates the denial of Igiebor's request for deferral of removal remains a live controversy because, in the event this court grants his petition, ICE would facilitate his return to the United States pursuant to its Facilitation of Return Policy, ICE Policy Directive 11061.1 (Feb. 24, 2012),

https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf.

Although removal does not create a statutory bar to review of a removal order, this court "must nevertheless determine whether [Igiebor's] case continues to present a case or controversy under Article III, section 2, of the Constitution." *Tapia Garcia v. INS*, 237 F.3d 1216, 1217 (10th Cir. 2001) (explaining changes Congress made to the INA in 1996, including eliminating from the statute a previous requirement that "a petitioner had to request a stay to preserve judicial review"). Mootness arises "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (quotation omitted). In that regard, both parties argue that the provisions of ICE Policy Directive 11061.1 render it not just possible, but instead likely, ICE would facilitate Igiebor's return to the United States should he prevail in any meaningful way in the instant appeal. ICE Policy Directive 1106.1 provides as follows:

> Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings. ICE will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order and may detain the alien upon his or her return to the United States.

-10-

The Ninth Circuit has held that the availability of an ICE-facilitated return pursuant to this policy directive constitutes "effective relief" preventing a petition like Igiebor's from becoming moot upon removal. *Del Cid Marroquin*, 823 F.3d at 936. The petitioner in *Del Cid Marroquin*, like Igiebor, was inadmissible by reason of his criminal convictions, ineligible for a waiver of inadmissibility, and eligible solely for deferral of removal under CAT. *See id.* In contrast to Igiebor, however, the petitioner in *Del Cid Marroquin* never held LPR status and, therefore, DHS asserted his return to the United States under ICE Policy Directive 11061.1 depended on the court "direct[ing] an outright grant of CAT protection"; the BIA "revers[ing] the [IJ's] decision and find[ing], in light of the overlooked evidence, that Petitioner is entitled to CAT deferral protection"; or the BIA remanding to the IJ for further proceedings. *Id.* (quotations omitted). Furthermore, even if such a situation arose, DHS could only guarantee it would "ordinarily" return the petitioner to the United States. *Id.*

Despite the somewhat limited possibility ICE Policy Directive 11061.1 would apply, the Ninth Circuit reasoned that "while granting Del Cid Marroquin's petition will not guarantee his return to the United States, it will at least increase his chances of being allowed to do so." *Id.* The theoretical availability of relief, in the Ninth Circuit's view, was sufficient to prevent the petitioner's case from being moot. *See id.* This court took a similar approach in *Rezaq v. Nalley*, 677

F.3d 1001, 1010 (10th Cir. 2012). In *Rezaq*, individuals convicted of terrorism-related grounds sued the government for violating the Due Process Clause based on their transfer to the Bureau of Prisons' highest-level maximum-security facility following the attacks of September 11, 2001. *Id.* at 1004-05. This court held the plaintiffs' claims were not moot, even though they had transferred to different facilities during the pendency of their cases. *Id.* at 1008-09. This court concluded redress was still possible because the plaintiffs had not been returned to the condition they were in prior to their transfer to the maximum-security facility. *Id.* at 1009; *see also id*. at 1010 ("A case is not moot when there is *some* possible remedy, even a partial remedy or one not requested by the plaintiff.").

Here, like the plaintiffs in *Rezaq* and because of ICE Policy Directive 11061.1, Igiebor has the potential to be restored to his pre-removal condition if this court grants his petition. Indeed, because Igiebor previously held LPR status, he would be significantly more likely to qualify for facilitation of his return than the petitioner in *Del Cid Marroquin*, who never held any legal status. Furthermore, if Igiebor prevails on his petition, ICE's policy provides it would facilitate his return, absent extraordinary circumstances, unlike the petitioner in *Del Cid Marroquin* for whom the possibility of return was substantially more tenuous. As a result, Igiebor retains a concrete stake in the outcome of his

petition and ICE Policy Directive 11061.1 would serve as an effectual remedy if this court grants his petition.[2]

## 2. 8 U.S.C. § 1252(a)(2)(C)–(D)

In its brief on appeal, the government asserts Igiebor's challenges to the BIA's denial of his request for deferral of removal are all factual in nature and are, therefore, subject to the jurisdictional bar set out in 8 U.S.C. § 1252(a)(2)(C)–(D). After briefing was complete in these proceedings, however, the Supreme Court issued its decision in *Nasrallah*. *Nasrallah* specifically held that orders denying CAT relief are not subject to the provisions of § 1252(a)(2)(C)–(D):

---

[2]This court specifically notes, as the government affirmatively attests in its supplemental brief, that no evidence in the record indicates extraordinary circumstances would prevent ICE from facilitating Igiebor's return to the United States if his petition is granted. The FAQs on ICE's website state that extraordinary circumstances "include, but are not limited to, situations where the return of an alien presents serious national security considerations or serious adverse foreign policy considerations." *Frequently Asked Questions (FAQs) on Facilitating Return for Lawfully Removed Aliens*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/faq/facilitating-return (last updated Aug. 13, 2020). In its supplemental brief in this court, the government affirms that Igiebor's theft and fraud-related convictions would not trigger the extraordinary circumstances exception under either adverse national security or foreign policy considerations. Nor, according to the government, would the allegations made by Igiebor in support of his request for CAT-based deferral of removal—that he faces prosecution for his homosexuality in Nigeria—trigger the policy. Finally, the government recognizes there exists in the record no credible evidence indicating Igiebor is currently facing prosecution for other crimes in Nigeria. Given all this, the government affirmatively states there is no reason to anticipate Igiebor would fit within one of the above-quoted exceptions to the facilitation of return policy.

-13-

[Relevant immigration statutes] establish that CAT orders may be reviewed together with final orders of removal in a court of appeals.  But judicial review of final orders of removal is somewhat limited in cases . . . involving noncitizens convicted of crimes specified in § 1252(a)(2)(C).  In those cases, a court of appeals may review constitutional or legal challenges to a final order of removal, but the court of appeals may not review *factual* challenges to a final order of removal.  § 1252(a)(2)(C)–(D).

The question in this case is the following: By precluding judicial review of factual challenges to final orders of removal, does the law also preclude judicial review of factual challenges to CAT orders?  We conclude that it does not.

The relevant statutory text precludes judicial review of factual challenges to final orders of removal—and only to final orders of removal.  In the deportation context, a final "order of removal" is a final order "concluding that the alien is deportable or ordering deportation."  § 1101(a)(47)(A).

A CAT order is not itself a final order of removal because it is not an order "concluding that the alien is deportable or ordering deportation."  As the Government acknowledges, a CAT order does not disturb the final order of removal.  An order granting CAT relief means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country.  But the noncitizen still "may be removed at any time to another country where he or she is not likely to be tortured."  8 C.F.R. §§ 1208.17(b)(2), 1208.16(f).

*Nasrallah*, 140 S. Ct. at 1690-91 (citations and footnote omitted).  Thus,

*Nasrallah* conclusively establishes that the provisions of § 1252(a)(2)(C)–(D)

have no application to this court's resolution of Igiebor's petition for review.[3]

---

[3]Given *Nasrallah*'s holding, the question naturally arises whether reversal of a denial of CAT-based deferral of removal would still have the effect of

(continued...)

## C. Discussion

### 1. Standard of Review

In his petition for review, Igiebor raises the following three issues: (1) the IJ erred by excluding certain evidence for lack of consular authentication, while the BIA erred by failing to review that exclusion in its decision dismissing his appeal; (2) the IJ violated his due process rights by not allowing him to explain perceived inconsistencies between his testimony and his corroborating evidence; and (3) the IJ and BIA applied an inappropriately stringent standard to their review of his testimony and corroborating evidence, which led to an erroneous adverse credibility finding.

---

[3](...continued)
voiding a removal order and, in Igiebor's case, restoring his LPR status. *See supra* III.B.1 (addressing whether Igiebor's removal rendered moot his pending petition for review). The government asserts the answer to that question is "yes." The government points to the FAQ page concerning Policy Directive 11061.1 on ICE's website, which provides as follows: "If you were a lawful permanent resident (LPR) prior to entry of the final removal order in your case, and the court's decision voids your removal order, U.S. Immigration and Customs Enforcement (ICE) will consider your LPR status to be reinstated." *Frequently Asked Questions (FAQs) on Facilitating Return for Lawfully Removed Aliens*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/faq/facilitating-return (last updated Aug. 13, 2020). According to the government, ICE has advised that, notwithstanding *Nasrallah*, the application of ICE Policy Directive 11061.1 remains unchanged and ICE will still consider Igiebor to be a returning LPR under its policy. The government confirms that ICE takes into account whether proceedings are remanded to, and ongoing before, the agency. Thus, regardless of *Nasrallah*'s holding, for purposes of the policy directive, the government affirms ICE would consider Igiebor's LPR status to be reinstated, and would facilitate his return, if this court were to grant his petition.

This court "review[s] the BIA's legal determinations de novo and its factual findings under a substantial-evidence standard." *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005). "The administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "Our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole. Thus, where the BIA determines a petitioner is not eligible for relief, we review the decision to determine whether the record on the whole provides substantial support for that determination." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006) (quotation, alteration, and citation omitted). Credibility determinations fit neatly within this framework:

> Credibility determinations are factual findings also subject to the substantial evidence test. Where the BIA's decision relies upon an IJ's initial findings, we must ensure that such determinations are substantially reasonable. And because an alien's testimony alone may support an application for [relief], 8 C.F.R. § [1208.16(c)], the IJ must give specific, cogent reasons for disbelieving it. An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion. Rather, it must be supported by substantial evidence in the record.

> In sum, although an applicant's testimony may be sufficient, without corroboration, to meet the burden of proof on any of the forms of relief, the applicant's testimony must also be found "credible" and "persuasive," and refer to "specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii); [*see also id.* § 1231(b)(3)(C) (making § 1158(b)(1)(B)(ii)–(iii) applicable in the context of CAT proceedings)]. The trier of fact may also weigh the testimony along

-16-

with other evidence of record. The credibility determination must be made based on the "totality of the circumstances" and "all relevant factors." § 1158(b)(1)(B)(iii).

*Id*. at 1204-05 (quotations, citations, and alterations omitted)

### 2. Merits

#### a. Authentication

This court begins with Igiebor's argument that the district court erred in excluding, on the basis of 8 C.F.R. § 1287.6(b), documents comprising Exhibit 9 to his application for CAT relief. Section 1287.6(b) addresses the authentication of foreign official records by the home country and the United States Foreign Service for countries like Nigeria that are not signatories to the Convention Abolishing the Requirement of Legislation for Foreign Public Documents. Igiebor contests the IJ's decision to exclude three documents based on this regulation: (1) an extract of the record from the Nigerian police force; (2) a medical record; and (3) an affidavit from the chief of the Nigerian community in which Igiebor's family resided. Igiebor claims these documents establish past torture and a likelihood of future torture, even in the face of an adverse credibility finding. This court limits its analysis to the first two documents because it is not clear from the record that the IJ actually excluded the third document. As Igiebor acknowledges, *see, e.g.*, Pet'r's Opening Br. at 5 n.4, 10 n.5, the IJ excepted the chief's affidavit from the lack-of-authentication ruling. Without affirmatively

deciding admissibility, the IJ deemed the chief's affidavit "not reliable" and concluded it "has little evidentiary value."

In urging error on the part of the IJ, Igiebor argues he should not have been required to obtain authentication from the government that tortured him. It is certainly true "courts generally do not view the alien's failure to obtain authentication [under the regulation governing proof of official records] as requiring the *rejection* of a document" because the procedures delineated there "generally require attestation of documents by the very government the alien is seeking to escape." *Yan v. Gonzales*, 438 F.3d 1249, 1256 n.7 (10th Cir. 2006). To avoid this problem, we have stated in several unpublished non-precedential decisions that asylum seekers may prove authentication by other means. *See, e.g., Gong Geng Chen v. Holder*, 444 F. App'x 305, 308 (10th Cir. 2011) (stating that "compliance with the regulation is not the only way to establish authenticity" and inferring an asylum seeker could "attest to any personal knowledge of the contents of the documents or otherwise explain why they should be accepted as authentic"); *Nak Chen v. Holder*, 380 F. App'x 748, 751-52 (10th Cir. 2010) (stating an alien must be allowed to authenticate a foreign document "through any recognized procedure, including the Federal Rules of Civil Procedure, the Federal Rules of Evidence, or any procedure that comports with common law rules of evidence, including affidavits or testimony"); *cf. Wu Xiong Tao v. Holder*, 367 F.

App'x 898, 909 (10th Cir. 2010) (suggesting an alien who wants to prove authenticity through other means must make "a specific evidentiary showing that he was unable to comply with the [authentication requirements] due to a lack of cooperation by government officials, either in this country or a foreign country").[4]

Although the IJ took an inflexible stance as to authentication of foreign official records during the hearing, the "Oral Decision of the Immigration Judge" is consistent with case law cited above. In that Oral Decision, the IJ assumed § 1287.6 is not the only means to authenticate a foreign record and concluded, albeit summarily, that Igiebor did not even attempt to authenticate the relevant documents by any other valid means. Moreover, the record shows the IJ tried to explain and resolve the evidentiary problems with Igiebor during the hearing. In any event, even if the IJ erroneously excluded the two documents based on a lack of consular authentication, any such error was remedied when the IJ considered the excluded evidence and found it to be unpersuasive.

The IJ concluded that even if the record from the Nigerian police force "had been admitted into the record, it would not have assisted [Igiebor] in meeting his burden of proof." The IJ determined the document was "unreliable" because it is not clear "who prepared the document, when it was prepared, and

_____

[4]Some of these cases involve 8 C.F.R. § 287.6, while others involve § 1287.6. Although they appear in different C.F.R. chapters of Title 8, we treat these regulations interchangeably because they contain the same language.

. . . what information was used to prepare this document." In addition, the IJ

noted the report "has not been shown to be what it purports to be." The police

report referenced a brother whom Igiebor did not identify as a sibling in his

application or testimony. It also concluded Fosa's death was caused by the

beating by community members, whereas Igiebor claimed it was caused by the

police beating during detention. Based on these deficiencies and disparities, the

IJ determined that "if admitted, this police report would have no evidentiary value

and would not be persuasive." The IJ similarly considered the medical report,

despite its technical exclusion, and found it "has little evidentiary value" because

(1) the author has no personal knowledge of what happened to Igiebor; (2) it is

only a summary, not the actual medical report; and (3) the source of the

information is unknown.[5]

The BIA did not err by failing to explicitly address Igiebor's argument that

the IJ improperly excluded the police and medical reports. The BIA adopted the

IJ's reasoning on this issue when it discussed and upheld the IJ's consideration of

---

[5]This court's holding that neither the IJ nor the BIA meaningfully erred in its treatment of Exhibit 9 fully resolves this particular issue. As set forth more fully below, *see infra* III.C.2.c, this court holds that the BIA did not err in (1) concluding the IJ's adverse credibility determination was supported by substantial evidence and (2) determining the IJ's finding that Igiebor failed to prove he would be tortured if returned to Nigeria was, likewise, supported by substantial evidence. In so holding, this court examines the entire record, including these particular documents.

the documentary evidence and the IJ's conclusion the documents would not have assisted Igiebor even if they had been admitted. If the BIA "incorporated the IJ's reasoning, either expressly or by implication," we may "impute the IJ's opinion to the BIA" and consider the IJ's findings as necessary to understand the BIA's decision. *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).

### b. Due Process

Igiebor raises "constitutional concerns" regarding the process by which the IJ determined the weight to be given his corroborating evidence. He argues the IJ violated his due process rights by not allowing him to explain perceived inconsistencies between his testimony and his corroborating evidence. The problems with Igiebor's arguments in this regard are significant.

A review of his brief before the BIA reveals Igiebor never argued the IJ's actions in resolving his request for CAT-based deferral of removal violated the Due Process Clause. Nor did the BIA consider such a claim. Because Igiebor did not raise the issue before the BIA, it is unexhausted and beyond this court's review. *Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1094 (10th Cir. 2008) ("[O]bjections to procedural errors or defects that the BIA could have remedied must be exhausted even if the alien later attempts to frame them in terms of constitutional due process on judicial review.").

-21-

Even if his briefing before the BIA could be said to have properly exhausted the issue, the claim fails on the merits. As a general matter, "[b]ecause aliens do not have a constitutional right to enter or remain in the United States, the only protections afforded are the minimal procedural due process rights for an opportunity to be heard at a meaningful time and in a meaningful manner." *Arambula-Medina v. Holder*, 572 F.3d 824, 828 (10th Cir. 2009) (quotation omitted). This is only true, however, because a petitioner in immigration proceedings "has no liberty or property interest in obtaining purely discretionary relief." *Id.* (quotation omitted). As noted above, however, CAT relief, in direct contrast to many other forms of relief available in immigration proceedings, is mandatory if the petitioner carries his burden of demonstrating he will be tortured if returned to his country of origin. *See supra* III.A; *see also Yuen Jin v. Mukasey*, 538 F.3d 143, 157 n.6 (2d Cir. 2008) (recognizing this distinction). The Supreme Court has explained that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quotation omitted); *see also Khouzam v. Attorney Gen. of United States*, 549 F.3d 235 (3d Cir. 2008) (breaking down *Mathews*'s requirement into its component parts and analyzing an immigration petitioner's due process claim against those component requirements).

To the extent Igiebor's brief could be read to assert the IJ had an affirmative duty to help him explain inconsistencies among his application, testimony, and documentary evidence, he offers no support of any kind for such a right. Instead, the exact opposite is true: a neutral and unbiased IJ is a fundamental hallmark of the Due Process Clause. *See Reyes-Vargas v. Barr*, 958 F.3d 1295, 1305 n.19 (10th Cir. 2020) (refusing to construe an IJ's powers in a way that "would cast the IJ as an advocate, not a neutral decisionmaker"); *Khouzam*, 549 F.3d at 257 (holding "fundamental requirement of due process" is the "opportunity to be heard at a meaningful time and in a meaningful manner" and it is "predicated upon the existence of a neutral and impartial decisionmaker" (quotations omitted)). Thus, to the extent Igiebor asks this court to impose upon IJs an obligation to help petitioners seeking CAT relief develop their cases, his due process claim necessarily fails. Alternatively, to the extent Igiebor is simply asserting he was not given a meaningful chance by the IJ to explain the inconsistencies and rehabilitate his credibility, such a claim is utterly belied by the administrative record. That is, the hearing transcript shows the IJ pointed out inconsistencies between Igiebor's testimony, application, and documentary evidence and gave Igiebor multiple opportunities to explain those inconsistencies. *See* Admin. R. at 101-02, 264-66, 266-94, 303-04, 305-06.

### c. Standard Employed by IJ and BIA

Igiebor argues the IJ and the BIA erred in applying an inappropriately stringent standard to their review of his testimony and corroborating evidence and this error led to an erroneous adverse credibility finding. This assertion is belied by the record, which demonstrates the analytical approach adopted by the IJ was entirely consistent with the governing statutes. *See* 8 U.S.C. § 1231(b)(3)(c) (providing that in determining whether the alien had established eligibility for CAT relief and in assessing credibility, the IJ must apply the standards set out in 8 U.S.C. § 1158(b)(1)(B)(ii)–(iii)); *id.* § 1158(b)(1)(B)(iii) (setting forth some of the factors on which the IJ may base a credibility determination under the "totality of the circumstances," including inconsistencies in the applicant's testimony or other statements, or between the testimony and other evidence of record, and falsehoods, inaccuracies, or "any other relevant factor").[6] Likewise, in reviewing the IJ's adverse credibility determination, the BIA applied the correct—"clear error"—standard of review and concluded, under "the totality of the circumstances," the inconsistencies in the record identified by the IJ were

---

[6]Igiebor's argument that the IJ was obligated to disregard inconsistencies among his application, hearing testimony, and documentary evidence because he was proceeding pro se is flatly inconsistent with the binding statutory standard. Furthermore, the cases he cites in his brief for such a proposition do not actually set out any such rule. Instead, those cases merely entail the normal process of review of a BIA decision for substantial evidence.

-24-

sufficient to support the adverse credibility determination. *See* 8 C.F.R. § 1003.1(d)(3)(i). In short, the IJ and BIA both applied the correct legal standards.

Furthermore, the BIA's ultimate adverse credibility determination is supported by substantial evidence. The inconsistencies identified by the IJ, which relate primarily to the alleged actions in Nigeria in 2006 and Igiebor's family's treatment of his mother in the aftermath of those events, go to the very heart of whether his recounting of the events was credible. *See* 8 C.F.R. § 1208.16(C)(3)(i) (providing that past torture is relevant to the possibility of future torture). Likewise, Igiebor's attempt to explain those inconsistencies—that he was provided aid in filling out his application and is illiterate—only created further questions as to his honesty given that he had stated, under penalty of perjury, that he alone prepared the asylum application. *See Diallo v. Gonzales*, 447 F.3d 1274, 1283 (10th Cir. 2006) (affirming an adverse credibility determination when the applicant "was given the opportunity to explain the inconsistencies but failed to do so to the IJ's satisfaction"). Having examined the entire administrative record, 8 U.S.C. § 1252(b)(4)(A), no "reasonable adjudicator would be compelled to conclude" Igiebor's testimony was credible. *Id.* § 1252(b)(4)(B). Thus, the BIA's adverse credibility determination is "conclusive." *Id.* That being the case, the BIA's determination that Igiebor did not carry his

-25-

burden of demonstrating he would be tortured if returned to Nigeria is also supported by substantial evidence.

## IV. CONCLUSION

For those reasons set out above, Igiebor's petition for review is hereby **DENIED**.