**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARIA TORRES DE LOPEZ, a/k/a Maria
Torresdelopez, a/k/a Maria Teresa
Torresdelopez, a/k/a Maria Teresa Teresa
Torrez Delopez, a/k/a Teresa Torrez-Saenz,
a/k/a Maria Torres de Lopez, a/k/a Maria
Teresa Teresa Torres Delopez,

      Petitioner,

v.

MERRICK B. GARLAND, United States
Attorney General,*

      Respondent.

No. 20-9523
(Petition for Review)

_____

**ORDER AND JUDGMENT**\*\*
_____

Before **MATHESON**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

---

\* On March 11, 2021, Merrick B. Garland became Attorney General of the
United States. Consequently, his name has been substituted for William P. Barr as
Respondent. *See* Fed. R. App. P. 43(c)(2).

\*\* After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Maria Torres de Lopez, a native and citizen of Mexico, appeals the denial of her application for deferral of removal under the United Nations Convention Against Torture (CAT). Exercising jurisdiction under 8 U.S.C. § 1252(a), we grant the petition for review and remand for further proceedings.

## I. Background

Torres de Lopez became a lawful permanent resident (LPR) of the United States in 1986 and resided in the Denver, Colorado area. In 2004, she pled guilty to one count of importing a quantity of marijuana. She was sentenced to one year plus one day in prison, and she lost her LPR status. In 2005, after her release from prison, an immigration judge (IJ) ordered Torres de Lopez removed to Mexico based on her conviction. Soon after her removal, she returned to Denver.

In 2018, acting on an anonymous tip to an immigration-law enforcement center, the government served her with a notice of intent to reinstate the prior order of removal. Before an immigration officer, Torres de Lopez expressed a fear of torture if she returns to Mexico, so her matter was referred to an IJ for withholding-only proceedings. *See* 8 C.F.R. § 208.31(e). There, she sought CAT deferral.[1]

Before the IJ, Torres de Lopez testified about the basis of her fear of torture if she returns to Mexico. In 2003, she traveled to Juárez, Mexico to promote a

---

[1] Initially, Torres de Lopez also applied for asylum, statutory withholding of removal, and CAT withholding, but she conceded that her importation conviction left her eligible only for CAT deferral.

2

multilevel marketing business selling nutritional supplements. There, her nephew, David, took her to a birthday party for the son of a man known as "El Pato." Torres de Lopez intended to discuss her business with party guests. One of the guests she met was Julio Cesar Escarega Murillo, known as "El Tigre," who was then a high-ranking member of the Juárez Cartel but has since led a splinter group to join the rival Sinaloa Cartel. Because Torres de Lopez had a Sam's Club card, El Pato asked her to go and purchase a few missing party supplies at a Sam's Club in nearby El Paso, Texas. El Pato gave her $60, and one of his friends provided her with a car. One of Torres de Lopez's sisters accompanied her on the drive. At the border, authorities searched the car and found 64 pounds of marijuana, which led to her importation conviction and imprisonment. Torres de Lopez told the IJ that she did not know the marijuana was in the car.

After her release from prison in 2005, Torres de Lopez went to Camargo, Mexico, where one of her sisters lived. There, David informed her that the marijuana she was convicted of importing belonged to El Tigre. About two weeks after Torres de Lopez's arrival there, she went on an outing to a lake with family. El Tigre and another man approached. According to Torres de Lopez, El Tigre said, "[W]e finally found you," and called her either a "dog" or a "bitch." Admin. R., Vol. I at 110. The other man grabbed her by the hair, pulled her back, and hit her on the side of the face with a hard metal object, possibly a gun, which left her bleeding and with permanent hearing damage. When her family approached, the men fled. She did not file a

3

police report because David told her doing so would make things worse since El Tigre was connected to the police.

After this incident, Torres de Lopez and David went to his mother's house in Chihuahua, Mexico. David's mother is another of Torres de Lopez's siblings. In December 2005, after Torres de Lopez had been at that house for two or three weeks, El Tigre and the man who had assaulted Torres de Lopez at the lake showed up. Hidden, she listened as El Tigre asked David where she was. El Tigre said he was going to keep looking for her and, by forming his hand into the shape of a gun and pointing it at David, threatened to shoot David if he did not tell El Tigre where Torres de Lopez was. The men then left.

David told Torres de Lopez that she had to flee because El Tigre wanted to kill her for losing the marijuana and because El Tigre held her responsible for the death of El Pato, who was killed while Torres de Lopez was in prison. Torres de Lopez immediately returned to the United States and has since lived in the Denver area.

In 2006, Torres de Lopez spoke to David, who told her never to return to Mexico "because they were threatening him asking for [her]." *Id.* at 119. Three days later, David disappeared. No one knows what happened to him. In 2016, David's brother, Jose Enrique, told Torres de Lopez "that he was going through the same thing. That they had beat him and they were threatening him asking him where [Torres de Lopez] was and he never said anything either." *Id.* at 120. He soon disappeared and, like David, has not been found.

4

In June 2017, a car followed Torres de Lopez into a Denver gas station at 4:30 a.m. The driver asked her to come over. As she approached, another man got out of the car and put a gun to her ribs, saying, "My boss needs you there." *Id.* at 122. Torres de Lopez recognized his voice; it was the man who had struck her at the lake in Camargo. When another car pulled into the gas station, the man returned to his car and it drove off. Torres de Lopez did not file a police report for fear of being deported.

In October 2017, Mexican authorities captured El Tigre, and according to the parties, he is currently imprisoned.

In 2018, David's and Jose Enrique's mother reported to the State Attorney General of Chihuahua that since Jose Enrique's disappearance in 2016, she had been receiving death threats.

Torres de Lopez's daughter also testified before the IJ. She said that from 2016 through mid-2018, she lived with her mother. On three occasions, she answered the door to find two Hispanic males who spoke only Spanish asking for "Teresa," which is the name by which Torres de Lopez's friends know her. The first time, the men's car had Mexican license plates. On the second occasion, the men were dressed in Mexican cowboy clothes, and judging by their garb, the daughter thought they were not Torres de Lopez's friends. On all three occasions the daughter told the men her mother did not live in the United States, and the third pair of men left visibly upset. After each of the first two instances, Torres de Lopez left the house for a week. The daughter did not tell her about the third instance.

5

Torres de Lopez's daughter and husband each testified that the family cannot afford to pay for security for her in Mexico.

Torres de Lopez also presented a report and live testimony from cultural anthropologist Howard Campbell, Ph.D. His research focuses on Mexican drug-trafficking culture, and he has testified in Immigration Court many times. Briefly, Dr. Campbell stated that even though El Tigre is now imprisoned, he remains powerful, and Torres de Lopez would be in grave danger of being located, tortured, and killed if she returns to any location in Mexico. He also stated that criminal organizations, like the Juárez and Sinaloa Cartels, operate with the acquiescence of all levels of the Mexican government.[2]

Although the IJ found Torres de Lopez and the other witnesses credible overall, the IJ denied her application for CAT deferral and ordered her removed to Mexico. The BIA summarily affirmed without opinion.

## II. Discussion

Where, as here, the BIA summarily affirms an IJ's decision without opinion, the IJ's decision is "the final substantive order for our review." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203 (10th Cir. 2006). We review an IJ's legal determinations de novo and any factual findings on a claim for CAT relief for

---

[2] According to Dr. Campbell, the Sinaloa Cartel "is one of the largest criminal organizations in the world," Admin. R., Vol. I at 164, and the Juárez Cartel, which has controlled the drug trade in the state of Chihuahua, a large part of northern Mexico, and other parts of Mexico for thirty years, remains "a dominant force," *id.* at 238.

6

substantial evidence. *Igiebor v. Barr*, 981 F.3d 1123, 1131 (10th Cir. 2020). Under

that standard, the IJ's factual findings "are conclusive unless any reasonable

adjudicator would be compelled to conclude to the contrary." 8 U.S.C.

§ 1252(b)(4)(B).[3]

Noncitizens like Torres de Lopez who are ineligible for withholding of

removal under the CAT may still be eligible for CAT deferral. *See* 8 C.F.R.

§§ 1208.16(c)(4), 1208.17(a). To demonstrate entitlement for CAT deferral, an

applicant must "establish that it is more likely than not that he or she would be

tortured if removed to the proposed country of removal." § 1208.16(c)(2). Torture is

"any act by which severe pain or suffering, whether physical or mental, is

intentionally inflicted on a person . . . by, or at the instigation of, or with the consent

or acquiescence of, a public official or other person acting in an official capacity."

*Id.* § 1208.18(a)(1). "The testimony of the applicant, if credible, may be sufficient to

sustain the burden of proof without corroboration." § 1208.16(c)(2). CAT deferral is

mandatory if an applicant satisfies the CAT's criteria. *See* § 1208.16(c)(4) (an

applicant meeting the CAT's criteria "shall be granted" CAT withholding or, at a

minimum, CAT deferral).

---

[3] Although Torres de Lopez is removable for committing a crime specified in § 1252(a)(2)(C), we may review her challenges to the IJ's factual findings notwithstanding § 1252(a)(2)(C) and (D), which would otherwise limit our jurisdiction to constitutional claims and questions of law. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1694 (2020) (holding that "§ 1252(a)(2)(C) & (D) do not preclude judicial review of a noncitizen's factual challenges to a CAT order").

In assessing the likelihood of torture if an applicant returns to the proposed country of removal, an IJ must consider (1) "[e]vidence of past torture inflicted upon the applicant," (2) "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured," (3) "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal," and (4) "[o]ther relevant information regarding conditions in the country of removal." *Id.* § 1208.16(c)(3).

The IJ framed the inquiry here as involving five steps: Torres de Lopez had to show it is more likely than not that El Tigre or his direct associates[4] would (1) "know she ha[d] been removed to Mexico," (2) "be motivated to find her," (3) "be able to find her," (4) "torture or kill her" after finding her, and (5) "do all of this with the acquiescence or willful blindness of the Mexican government." Admin. R., Vol. I at 58. The IJ then analyzed the first three steps in that framework and determined that Torres de Lopez presented nothing more than a series of suppositions about what might happen if she is removed to Mexico, and that was insufficient to meet her burden.

As we explain, the evidence compels a contrary conclusion to parts of the IJ's analysis; we are compelled to conclude it is more likely than not that El Tigre would be aware if Torres de Lopez is removed to Mexico, and that El Tigre and his direct

---

[4] We use the term "direct associates" as the IJ did in her step-three analysis— to refer to cartel members that El Tigre directs or who are specifically loyal to him, as opposed to cartel members as a whole. *See* Admin. R., Vol. I at 59.

associates would have both sufficient motivation and ability to locate Torres de Lopez anywhere in Mexico. But the evidence does not compel the conclusion that the Juárez or Sinaloa cartels have a sufficient institutional motivation to locate Torres de Lopez anywhere in Mexico. And the questions that remain are ones the IJ did not reach—if El Tigre or his direct associates found Torres de Lopez in Mexico, would they inflict any harm on her, would that harm be severe enough to constitute torture for CAT purposes, and would Mexican public officials instigate, consent to, or acquiesce in such harm? We may not answer those questions in the first instance and remand them to the IJ for initial consideration.

## A. Awareness of removal

At step one of the IJ's analytical framework,[5] the IJ found Torres de Lopez did not show it was more likely than not that El Tigre and his direct associates would be aware of her removal to Mexico. The sole reason the IJ gave was Torres de Lopez could not show El Tigre or his direct associates provided the anonymous tip that led immigration authorities to her in 2018. This finding rests on insubstantial evidence and overlooks substantial contrary evidence. First, El Tigre became aware of Torres de Lopez's first removal, in 2005, when within a matter of weeks he confronted her at the lake in Camargo. Second, Dr. Campbell testified that "criminal organizations and the government overlap and so police, as well as cartel members, use databases,

---

[5] For convenience, we frame our discussion by reference to the steps in the IJ's framework. But we do not mean to suggest that these steps are necessarily formal elements of any CAT deferral analysis.

9

. . . demographic information from the Mexican census, and other sources of information to track people viewed as being enemies of cartels all over the country," Admin. R., Vol. I at 168. The IJ did not question this testimony, which suggests El Tigre previously discovered Torres de Lopez after her 2005 removal from the United states and could through various channels again discover her if she were removed to Mexico from the United States.[6] Thus, we are compelled to conclude that it is more likely than not that El Tigre or his direct associates would be aware of her removal.

## B. Inclination to pursue, locate, and harm

At step two of the IJ's framework, the IJ found Torres de Lopez had not met her burden to show it is more likely than not that El Tigre would be inclined to pursue her in Mexico. The IJ relied on the fact that the loss of the 64 pounds of marijuana occurred sixteen years prior to the hearing, and Dr. Campbell testified that such a quantity would be a relatively small loss for a large cartel. But as Torres de Lopez observes, these facts are of little consequence because El Tigre and another man assaulted her at the lake in Camargo in 2005, and the evidence shows El Tigre and his direct associates have kept looking for her up until 2018, when immigration authorities caught up with her. This evidence compels the conclusion that the drug quantity and passage of time since Torres de Lopez's arrest have not affected El Tigre's motivation to find Torres de Lopez if she is removed to Mexico.

---

[6] Indeed, the record contains no evidence contradicting Torres de Lopez's testimony on this issue. And, the mere passage of time, in this instance, does not serve to undermine Torrez de Lopez's evidence that El Tigre would locate her upon her removal to Mexico.

10

The IJ also discounted the death of El Pato as a factor motivating El Tigre to find Torres de Lopez because Torres de Lopez provided no details of El Pato's death or why El Tigre viewed her as connected to it. But we agree with Torres de Lopez that the relevant inquiry is not why El Tigre thinks she is to blame for El Pato's death or whether his belief is correct, but whether he, in fact, blames her. Torres de Lopez testified that David told her as much, and the IJ did not question the credibility of that testimony.

For these reasons, we conclude that the evidence compels the conclusion that, more likely than not, El Tigre and his direct associates have sufficient motivation to pursue Torres de Lopez if she is removed to Mexico. But we cannot say the same thing about the cartels' motivation, which the IJ addressed in her step-three findings. We thus turn to those.

The IJ began her step-three analysis by assuming El Tigre would have sufficient motivation to pursue Torres de Lopez and found she failed to show it is more likely than not that El Tigre would be able to locate her anywhere in Mexico "or even recognize her outside of Chihuahua." Admin. R., Vol. I at 59. In support, the IJ first relied on Dr. Campbell's testimony that although El Tigre is now imprisoned and "continues to wield power, '[that] power has been lessened.'" *Id.* (quoting *id.* at 238). Torres de Lopez claims this conclusion overlooks Dr. Campbell's opinions that (1) although imprisoned, El Tigre remains "very powerful," *id.* at 165; (2) imprisoned cartel leaders continue to run their cartels from prison and have the ability to direct the torture and murder of people deemed a threat

11

to cartel interests; (3) Torres de Lopez is viewed as El Tigre's enemy, so she is of interest to both cartels, which remain very active even after his imprisonment; and (4) the Sinaloa Cartel poses an "additional risk" to Torres de Lopez," *id.* at 238. Relatedly, Torres de Lopez faults the IJ's handling of Dr. Campbell's testimony that through their extensive association with the Mexican government, cartel members have access to and use government data on the Mexican population to track people they view as enemies.

The IJ need not "write an exegesis on every contention," but instead must "consider the issues raised, and announce [a] decision in terms sufficient to enable a reviewing court to perceive that [the IJ] has heard and thought and not merely reacted." *Witjaksono v. Holder*, 573 F.3d 968, 978 (10th Cir. 2009) (internal quotation marks omitted). And the IJ did that with regard to Dr. Campbell's testimony concerning the cartels' interest in Torres de Lopez. Earlier in her decision, the IJ noted Dr. Campbell's testimony that Torres de Lopez "is now seen as an enemy of El Tigre, who continues to . . . help run his cartel from prison," and "that criminal organizations in Mexico have extensive reach and often work with government officials at all different levels." Admin. R., Vol. I at 58. But the IJ concluded that the Sinaloa Cartel lacks interest in Torres de Lopez because "El Tigre and his direct associates are the only cartel members with whom [Torres de Lopez] has had direct contact, and according to Dr. Campbell, El Tigre took a splinter group and broke off from the Juárez Cartel to join the Sinaloa Cartel." *Id.* at 59. And the IJ reasoned that although testimony about the appearance of men at Torres de Lopez's house, the

12

disappearances of David and Jose Enrique, and articles on the state of Mexican cartel violence suggest that Torres de Lopez "would be in danger if she returned to and remained in [the state of] Chihuahua," the lack of evidence "that anyone in the Juárez Cartel aside from El Tigre's men had any interaction with or interest in [Torres de Lopez] . . . undermines [her] contention that the cartels would seek to locate her anywhere in Mexico." *Id.*

Thus, the IJ adequately took into consideration Dr. Campbell's opinions regarding El Tigre's post-imprisonment power and the cartels' interest in Torres de Lopez and explained where she disagreed with them. And the evidence does not compel a different conclusion regarding the cartels' lack of interest in Torres de Lopez, particularly in view of the lack of evidence that any cartel members other than El Tigre and his direct associates have taken any action against Torres de Lopez and her family. There is simply insufficient evidence to compel the conclusion that the cartels possess institutional motivation to find Torres de Lopez from El Tigre's direction to his direct associates.[7] So for purposes of our analysis, the inquiry narrows to whether the evidence compels the conclusion that it is more likely than not that an imprisoned El Tigre and his direct associates would be able to locate Torres de Lopez anywhere in Mexico.

---

[7] We note that Dr. Campbell based his opinion that Torres de Lopez is viewed as an enemy of the cartels in part on "her knowledge of cartel operations and crimes." Admin. R., Vol. I at 238. But there is no evidence that she has any knowledge of cartel operations or of any cartel crime other than the attempt to have her smuggle marijuana into the United States.

We think it does. As Dr. Campbell explained, criminal organizations have close ties to the Mexican government and police and thus access to information about Mexican citizens' whereabouts, and imprisoned cartel leaders retain the ability to direct torture and murder. Based on this premise, Dr. Campbell opined that it would be difficult for Torres de Lopez to safely relocate outside of Chihuahua. The IJ did not doubt Dr. Campbell's premise but disagreed with his opinion because "Mexico is a large country, and [Torres de Lopez] never tried to relocate anywhere in Mexico outside the state of Chihuahua." *Id.* However, as Torres de Lopez points out, the IJ's reasoning ignores that El Tigre was able to find her in Colorado, which is a considerable distance from Chihuahua. Because El Tigre was able to locate Torres de Lopez in the United States, and his access to Mexican government information enhances his ability to locate her in Mexico, we are compelled, on this record, to conclude it is more likely than not that he or his direct associates would be able to locate her in Mexico.[8]

In reaching this conclusion, we agree with Torres de Lopez that the evidence does not support the IJ's finding that "there is reason to believe that if the cartel targeted David, his brother, and his mother, it was for reasons unrelated to [Torres de Lopez's] arrest and conviction." *Id.* The record evidence instead compels the conclusion that El Tigre targeted David, his brother, and their mother because they

---

[8] We do not conclude that the ability to relocate in another part of the country is not a permissible consideration—only that, on the facts present in this case, relocation will not preclude El Tigre from locating Torres de Lopez.

14

refused to tell him where Torres de Lopez was. Torres de Lopez testified that David was not involved in the drug trade, *id.* at 134-35, and the IJ did not question the credibility of that testimony. And the other evidence points in but one direction—that the threats to David, Jose Enrique, and their mother were related to Torres de Lopez. In 2005, El Tigre threatened to shoot David if he did not tell El Tigre where Torres de Lopez was. A mere three days passed between David's call to warn Torres de Lopez never to return to Mexico because El Tigre was still threatening him about her location and David's disappearance. Jose Enrique also disappeared soon after he reported to Torres de Lopez that El Tigre had beaten and threatened him about her. And in 2018, after El Tigre had already been captured, their mother reported that she, too, was being threatened.

The government counters that threats are not included in the definition of torture. However, the issue is not whether the threats to Torres de Lopez's family members, or even to Torres de Lopez herself, amount to torture, but whether they support the likelihood that Torres de Lopez will be tortured if she returns to Mexico. They do in this instance.

The government also relies on *Ritonga v. Holder*, 633 F.3d 971, 977-79 (10th Cir. 2011), where we explained that the continued presence of a CAT applicant's family in the country of removal without harm undercuts the likelihood of torture. Applying that principle, the government directs our attention to the IJ's finding that although one of Torres de Lopez's sisters (David and Jose Enrique's mother) has been threatened, her other six siblings continue to live in Mexico without

15

threats or harm, including the sister who was with Torres de Lopez when she was arrested at the border with the marijuana. But the fact that Torres de Lopez's other siblings have not been threatened or harmed does not detract from the threats and serious harms that have occurred to David, Jose Enrique, and their mother. And there is no evidence that El Tigre blames the sister who accompanied Torres de Lopez to the border for either losing the marijuana or El Pato's death, so the lack of threats or harm to that sister is not a compelling reason to discount the risk to Torres de Lopez. Furthermore, we do not think Torres de Lopez must show that none of her family members live free of threats or harm; nothing in *Ritonga* or, as far as we can tell, any other precedent of this circuit requires that.

## C. Torture and acquiescence

All this brings us to the fourth and fifth steps in the IJ's framework—if El Tigre or his direct associates find Torres de Lopez, will they harm her and, if so, will the harm amount to torture? Again, torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). The IJ never reached whether El Tigre or his direct associates would harm Torres de Lopez if they found her in Mexico, the severity of any pain or suffering they might inflict, or whether any Mexican public official would instigate, consent to, or acquiesce in any such acts. The IJ's analysis stopped at step three of her framework when she concluded that the evidence was insufficient to show that even if El Tigre was still

16

interested in Torres de Lopez, he would not be able to locate her outside of the state of Chihuahua.  As discussed, the evidence compels a contrary step-three conclusion. And we cannot take up the analysis that must come next.  *See Mickeviciute v. INS*, 327 F.3d 1159, 1165 (10th Cir. 2003) ("Because an agency has a duty not only to reach an outcome, but to explain that outcome, we intrude on the agency's authority not only by reaching a certain result on the merits . . . , but also by supporting a result reached by the agency with reasoning not explicitly relied on by the agency."). Accordingly, we must remand to the agency to conduct the inquiry into the fourth and fifth steps in the first instance.

### III.  Conclusion

We grant the petition for review and remand to the agency for further proceedings consistent with our decision.

Entered for the Court


Joel M. Carson III
Circuit Judge